## GEORGIA RAILROAD AND BANKING COMPANY v. WRIGHT, comptroller-general, et al.

1. In a suit in equity in the circuit court of the United States A and B were nominally codefendants, though in reality B's interests were adverse to those of A, and identical with those of the plaintiff. Judgment was rendered for the plaintiff; whereupon A notified his codefendant to join in an appeal. This B declined to do, expressing himself as content with the decree rendered; and A then took an order allowing him to sever and appeal alone. On final trial in the United States Supreme Court the judgment of the trial court was reversed and the original bill dismissed. *Held*, that in a subsequent action by B against A, growing out of the same cause of action in the State courts, B was estopped to

set up any matter which was or might have been pleaded by him in his own substantial interest in the Federal court.

2. A suit to enjoin the collection of taxes for one year is no bar to a suit to enjoin similar taxes for another year. This is so because the taxes for each year constitute a separate cause of action. (LUMPKIN, J., dissents.)

2 (a). (Per LUMPKIN, J.) If there is any estoppel by judgment at all in this case, under the pleadings and decree in the record from the Federal court it extends not alone to the tax of one year but to the taxability of the stock. Under the pleadings and evidence before it and the prayers of the bill, the decree of the circuit court of the United States contained the following: "It is further ordered and adjudged that the said William A. Wright, comptroller-general, is without any authority of law to undertake to collect taxes upon said shares of stock, and is not authorized as comptroller-general so to do, and he is hereby perpetually enjoined from issuing any execution or taking any steps to collect said taxes upon said shares of stock, and that the said Georgia Railroad and Banking Company is enjoined from making any return of said shares of stock for the purpose of taxation, or from paying any taxes thereon, or doing any act or thing recognizing liability of said shares of stock to be taxed." This was the decree reversed by the Supreme Court of the United States.

3. The case of *Wright* v. *Southwestern R. Co.*, 64 *Ga.* 783, announced as the law of this State that the situs of stock in a foreign railroad corporation whose road was located outside of Georgia was in the State where the road was located, and that therefore the stock was not taxable in this State. That case was of binding, statutory effect until the passage of the act approved October 20, 1885, which gave such stock a situs for purposes of taxation in Georgia.

4. Under the title, "An act to provide for the correct returns of the property in this State for the purpose of taxation, and for other purposes," the General Assembly could constitutionally enact that certain specified objects should be considered personal property for the purpose of taxation.

5. The failure of the compilers of the Code of 1895 to embrace therein the provisions of the act of 1885, referred to in the third headnote, did not, in the absence of conflicting statutes in that code, amount to a repeal by implication of the portion of the act referred to; and that portion of the act is still the law of Georgia.

6. The failure of the taxing authorities to directly tax shares of stock in domestic corporations whose property is located in Georgia as property in the hands of the shareholders (the corporate property being taxed instead), while at the same time levying a direct tax upon shares of stock in foreign corporations whose property is outside the State, belonging to citizens of Georgia, is not a denial to the holder of the foreign shares of the equal protection of the laws.

7. It is not in this case necessary to determine whether shares of stock in a domestic corporation in the hands of a stockholder are required to be taxed as such in order to comply with the uniformity clause of the constitution. Nor is it necessary to determine, if domestic shares are taxa-

ble, whether it would be double taxation to assess them for taxation in the hands of the shareholder and also include them in the return made by the president of the corporation as required by law.

7 (*a*). (Per CANDLER, J.) All property in the State, not exempt under the constitution, must be taxed. Stock in corporations is property. When the corporate property is in Georgia, a tax upon it is in effect a tax also upon the stock. When the corporate property is outside the State and can not be taxed, and the stock is held by a citizen of Georgia, the stock must be directly taxed as the property of the citizen. This is not a violation of the constitutional provision that "all taxation shall be uniform upon the same class of subjects, and ad valorem on all property subject to be taxed within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."

8. The court below was fully authorized to find that in the administration of the law the policy of the State was not such as to deny to the plaintiff in error the equal protection of the laws.

9. The sections of the Political Code which prescribe the steps to be taken by the comptroller-general in the event of the failure of individuals or corporations to make returns for taxation are not restricted to cases where no return whatever is made, but apply equally to cases where property owned by the citizen and subject to taxation is withheld from the return.

10. The acceptance by the comptroller-general of a return from which taxable property of the citizen has been omitted does not bar the State of its right subsequently to proceed against the delinquent for the tax due on the omitted property.

11. The Georgia scheme of taxation requires the citizen to know what property owned by him is subject to taxation, and contemplates that he will disclose it fully to the taxing officer. Every opportunity in the way of notice, protest, hearing, and arbitration is afforded him to correct any mistake of that officer and to obtain exact and even justice. To the defaulter no "machinery" is furnished for the correction of his own error; he is entitled to no notice, hearing, or arbitration, but the officer is required, from the best information obtainable, to ascertain the value of the property and assess it accordingly. This scheme of taxation is not unconstitutional.

12. It does not appear that the comptroller-general, who, in arriving at the value of the property taxed, was only obliged to proceed upon "the best information he could procure," made an excessive assessment.

13. The fact that the plaintiff in error made annual statements showing its ownership of the stock sought to be taxed, and that these statements were accessible to the comptroller-general, does not bar the right of the State to collect the tax on the stock for the years when it was not returned.

14. Until the passage of the act approved November 11, 1889, taxes did not bear interest in this State.

15. The assessments made showed on their face every jurisdictional fact necessary to authorize the comptroller-general to proceed thereunder.

16. A statement made to the taxing officer, "for the purpose of furnishing-

the office of the comptroller-general with information sought by said office, and not for the purpose of making a return of property for State taxation," can not be treated as in any sense a return.

17. Section 3777 of the Civil Code, providing a bar for the State in certain cases when the citizen would under like circumstances be barred, is in derogation of the common law and of the right of the State to exercise its sovereign power of taxation, and should be strictly construed.

18. Section 3775 of the Civil Code, providing an equitable bar in cases where, "from the lapse of time and laches of the complainant, it would be inequitable to allow a party to enforce his legal rights," is not available to a complainant in an equitable proceeding to enjoin the enforcement of a purely legal right.

19. A tax is not a debt in the sense that it will be barred by a statute of limitations against "actions upon open account, or for the breach of any contract not under the hand of the party sought to be charged, or upon any implied assumpsit or undertaking."

20. The act of 1887 (Pol. Code, §§ 890, 891), when construed as a whole, provides a statute of limitation against the right of the State and its subordinate public corporations to enforce a lien for taxes. Such a lien is barred not only by a failure to have the proper entries made on the tax execution and recorded as required by the act, but also by a failure to issue the tax execution within seven years from the date that such execution may be lawfully issued. The lien of the State or its subordinate public corporations is to this extent placed, by the act above referred to, fully under the operation of the "dormant-judgment act." (CANDLER, J., dissents.)

20(a). (Per CANDLER, J.) Sections 890 and 891 of the Political Code interpose a bar to the enforcement of claims for taxes only after they have been placed in execution, and do not apply to the State's claim for taxes before an execution has been issued.

21. The statute of limitations did not run against the State during the time that the comptroller-general was enjoined by the Federal court from issuing any executions for taxes on the stock in dispute.

Argued November 22-25, 1905.— Decided January 9, 1906.

Petition for injunction. Before Judge Pendleton. Fulton superior court. June 14, 1905.

By an act approved February 27, 1875 (Acts 1875, p. 235), the General Assembly authorized the Georgia Railroad and Banking Company and the Central Railroad and Banking Company of Georgia to become purchasers of the Western Railroad of Alabama, its property and franchises or any part thereof, at any sale of the property that might be had in Georgia or Alabama or both, the act providing that the companies mentioned "may hold the title to the same under their existing corporate capacities, or may acquire and hold stock in the present Western Railroad Company of Alabama, or any new corporation that shall be organized to take the place of

the same." Under this act the two railroad companies referred to
purchased, on September 1, 1875, each an undivided one-half inter-
est in fee of the property and franchises of the Western Railroad
Company of Alabama. On May 7, 1881, the Georgia Railroad and
Banking Company leased to William M. Wadley and assigns all of
its interest in the Western Railroad of Alabama for a period of
ninety-nine years from April 1, 1881, "and he and his assigns have
remained in possession thereof ever since, and have, to the exclusion
of [the Georgia Railroad and Banking Company], controlled, man-
aged, and used said railroad and its franchises and received all the
gross earnings of said half interest; have paid one half of the
operating expenses, taxes, and other fixed charges; and have re-
tained for themselves a half of the net earnings, when there were
any net earnings." In October, 1882, the two railroad companies
(which, for convenience will be called the Georgia and the Central
railroads), acting in concert, procured their incorporation under the
laws of Alabama as the Western Railway of Alabama; and the Geor-
gia Railroad made a deed to the new corporation, conveying all of
its interest in the railroad properties already mentioned. The West-
ern Railway of Alabama was eventually capitalized at $3,000,000,
and one half of the stock, or fifteen thousand shares, was issued to
the Georgia Railroad. William A. Wright, comptroller-general of
Georgia, early in the year 1905, made a demand upon the Georgia
Railroad for taxes on these fifteen thousand shares of stock for
each of the years from 1883 to 1904 inclusive, with interest on the
tax of each year from December 20 of that year at the rate of seven
per cent. per annum, the aggregate of the principal of the taxes de-
manded being $125,974. The demand was refused; whereupon the
comptroller-general issued twenty-two executions, aggregating the
amount mentioned, and placed them in the hands of Nelms, sheriff
of Fulton county, for levy. The present suit arises upon the peti-
tion of the Georgia Railroad to enjoin the enforcement of the execu-
tions or the collection of the tax on its stock in the Western Railway
of Alabama for the year mentioned. The petition and the amend-
ments thereto are voluminous, and, together with the answer of the
defendants, present a large number of points for adjudication. In
the interest of brevity these points will not be enumerated at this
stage of the discussion, but will be taken up and disposed of seriatim.
The trial court denied an injunction, and the plaintiff excepted.

*Joseph B. & Bryan Cumming, Alexander C. King, Joseph R. Lamar,* and *Sanders McDaniel,* for plaintiff.

*John C. Hart,* attorney-general, *Boykin Wright,* and *Hoke Smith,* for defendants.

CANDLER, J.    (After making the foregoing statement.)

1. Shortly after the lease by the Georgia Railroad to Wadley was made, it was assigned to the Louisville & Nashville Railroad Company, which subsequently became the sole lessee of the Western Railway of Alabama; and in 1899 the Atlantic Coast Line Company acquired a half interest in the lease. Under the terms of the lease, the lessee companies were bound to pay all taxes that might be collectible from the lessors. In August, 1901, the Louisville & Nashville Railroad Company and the Atlantic Coast Line Company, citizens respectively of Kentucky and Virginia, filed in the United States circuit court for the northern district of Georgia a bill in equity against Wright, comptroller-general, and the Georgia Railroad and Banking Company, reciting that the comptroller-general had demanded of the Georgia Railroad taxes upon its fifteen thousand shares of stock in the Western Railway of Alabama for the year 1900, that under the lease to them the lessee companies, and not the Georgia Railroad, would have to pay the tax if it were collected; that under the laws of Georgia the shares in question were not subject to taxation; and praying that the comptroller-general be enjoined from collecting, and the Georgia Railroad from paying, the tax demanded. On the hearing before the judge of the circuit court an injunction was granted. The comptroller-general, desiring to appeal the case, served on his codefendant, the Georgia Railroad, the following written notice: "A decree having been entered in the above-stated case against the defendants, and William A. Wright, comptroller-general, one of the defendants, desiring to appeal to the circuit court of appeals, you as a codefendant therein are hereby respectfully notified to appear and join in the appeal." Service of this notice was acknowledged, and the reply made thereto that "Defendant hereby refuses to join in said appeal, being content with the decree rendered in said cause." An order was then taken by the comptroller-general, permitting him to make the appeal alone, and this was accordingly done. The circuit court of appeals affirmed the decision of the circuit court, and the case was then taken by certiorari to the Supreme Court of the

United States, where the decisions of the courts below were reversed, and the cause "remanded to the circuit court of the United States for the northern district of Georgia, with directions to dismiss the bill of complaint." The mandate of the Supreme Court was duly made the judgment of the circuit court. In their answer to the petition filed by the Georgia Railroad in the present case, the defendants pleaded res adjudicata, or, to be more accurate, estoppel by judgment, claiming that the Georgia Railroad is concluded by the judgment against it entered in accordance with the mandate of the Supreme Court of the United States, whereby the original bill of complaint was dismissed; and this plea raises one of the most difficult and important questions in a case abounding in questions of that character.

In the suit in the Federal court the Georgia Railroad was nominally a codefendant of the comptroller-general, but in reality an adverse party at interest. The judgment enjoining it from paying the tax was exactly what it desired, and its interest lay in affirming, rather than in disturbing that judgment. Consequently, when its codefendant, the comptroller-general, took the case to the higher court, if it desired, in its own name, to be represented in the appellate proceedings as to its real and substantial, rather than its fictitious interests, it had every opportunity by appropriate adversary pleadings to place itself nominally as well as really at arm's length with its codefendant. It preferred, however, to leave its lessors to defend its substantial rights, and to allow the judgment, nominally against it but really in its favor, to remain undisturbed by any act of its own. The judgment of the Supreme Court of the United States was rendered in a case to which, nominally, it was not a party, but which involved questions very vital to it and to which it had every opportunity to be made a party in its own name. The judgment against the Louisville & Nashville and Atlantic Coast Line companies necessarily and in terms carried with it an adjudication that the Georgia Railroad was liable for the tax on this stock for the year 1900; and when, in accordance with the mandate of the Supreme Court of the United States, the original bill in equity filed by the two plaintiff companies was dismissed, the Georgia Railroad was concluded as to all questions growing out of that cause of action which were or might have been raised by it to protect its interests in that suit. "The mere circumstance of any persons hav-

ing been formally arrayed on the same side in a suit is immaterial, . . and it is agreed upon now, that they will be estopped by a decision on a matter which was actually in issue between them, and as to which they had an active controversy against each other." Hukm Chand, Res Adj. §78; Van Fleet, Former Adj. §256, p. 576; 24 Am. & Eng. Enc. L. (2d ed.) 733; 1 Dan. Ch. Pl. & Pr. (6th Am. ed.) *659; Foster's Fed. Pr. §300; Case v. Beauregard, 101 U. S. 688; Corcoran v. Chesapeake Canal Co., 94 U. S. 741; Riley v. Bank, 81 Md. 14, s. c. 31 Atl. 585; Louis v. Brown Township, 109 U. S. 163; Scotland County v. Hill, 112 U. S. 183; Waldo v. Waldo, 52 Mich. 91, s. c. 17 N. W. 709.

2. Counsel for the Georgia Railroad, however, contend that even if it is concluded by the judgment of the Supreme Court of the United States as to its liability for the tax sought to be enjoined in the proceeding before that court, the estoppel of the judgment extends only to the question of the railroad's liability for the tax for the year 1900, and that it is not cut off from contesting the validity of the tax for all the other years involved in the present suit, from 1883 to 1904 inclusive. The question turns, of course, largely if not entirely upon whether suits for different taxes, or for taxes for different years, constitute different causes of action; for suits to enjoin the collection of taxes would necessarily be governed by the same principles. In 2 Cooley on Taxation, 845, it is said: "Upon the question whether a judgment establishing a liability to pay taxes for certain years is, in a subsequent action between the same parties, res adjudicata as to the liability for taxes of a succeeding year when the facts affecting the liability are the same in the two cases, the authorities do not agree. It is held in Iowa, Kentucky, Michigan, Mississippi, and Tennessee, that the judgment for a tax is conclusive as to that tax merely, and in suits for taxes of other years is important only as a precedent. [Citing Davenport v. Chicago R. Co., 38 Ia. 633, 640; Newport v. Commonwealth (Ky.), 50 S. W. 845, s. c. 51 S. W. 433; Louisville Bridge Co. v. Louisville (Ky.), 58 S. W. 598, s. c. 65 S. W. 814; Michigan R. Co. v. Auditor-General, 9 Mich. 448; Lake Shore R. Co. v. People, 46 Mich. 193; Adams v. Yazoo R. Co., 77 Miss. 194; State v. Bank, 95 Tenn. 222; State v. Bank, 95 Tenn. 231; Union Bank v. Memphis, 101 Tenn. 154.] Recent decisions of the Federal Supreme Court maintain the contrary doctrine, but have not met the

approval of the State tribunals." In Keokuk R. Co. *v.* Missouri, 152 U. S. 301, relied upon by counsel for the railroad company in the present case, it was held that "A suit for taxes for one year is no bar to a suit for taxes for another year;" and in the opinion Mr. Justice Brown said: "The two suits are for distinct and separate causes of action. If there were any distinct question litigated and settled in the prior suit, the decision of the court upon that question might raise an estoppel in another suit upon the principle stated in Cromwell *v.* County of Sac, 94 U. S. 351. But, as was held in that case, where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. . . In the case of Davenport *v.* Chicago R. Co., 38 Ia. 633, 640, the Supreme Court of Iowa held that a decree in favor of a railway company in a suit for taxes for a prior year would not estop the State from collecting the tax for a subsequent year, each year's taxes constituting a distinct and separate cause of action. 'The cases,' said the court, 'are unlike those where two causes of action (as two promissory notes) forming the subject-matter of successive actions between the same parties, *both growing out of the same transaction,* in which a defense set up in the first suit, and held good, will conclude the parties in the second. . . Taxes of separate years do not in any just sense grow out of the same transaction. They are like distinct claims on two promissory notes made upon two distinct and separate, though similar, transactions between the same parties. A judgment on one of such notes, it is quite clear, would not be of any force as an estoppel in an action on the other note between the same parties.' It could never be tolerated that the State should be forever barred in its collection of taxes by an erroneous decision." As indicated by the quotation which we have made from Cooley on Taxation, however, the Supreme Court of the United States has not adhered to the principles announced in the case cited. See New Orleans *v.* Citizens Bank, 167 U. S. 371; Baldwin *v.* Maryland, 179 U. S. 220; Deposit Bank *v.* Frankfort, 191 U. S. 499. In Newport *v.* Commonwealth (Ky.), 50 S. W. 845, it was held that a judgment for the defendant in an action to recover taxes for one year is not a bar to an action to recover taxes on the same property for another

year. Hazelrigg, C. J., and Burnam, J., concurred in a separate opinion on this branch of the case, which is reported in 51 S. W. 433, and from which the following forcible language is quoted: "The power to tax is a high governmental power, exercised against the will of the person taxed, and, in our opinion, a decision as to one cause of action arising under a tax statute is no more binding upon the government or the citizen than the construction of a penal statute would be in a second prosecution against the same person for an offense exactly similar. The former adjudication would, in such case, have weight as a precedent, but would not bind the parties by way of estoppel. The rulings of the court upon the legal questions involved are authority here to the extent, and no further, that like decisions would be in a suit between different parties. As matter of public policy, and upon grounds of public necessity, we think the principle of res adjudicata ought not to be applied to questions of taxation where the State is exercising its sovereign power." In Georgia authority on the subject now under consideration is scant, and only indirectly in point. *Mayor of Savannah.* v. *Dehoney, 55 Ga.* 33, was a case in which a number of livery-stable keepers filed their bill to enjoin the municipal authorities of Savannah from collecting a license fee or tax on vehicles for transporting passengers. It was held, for reasons which appear in the opinion, that an injunction was properly granted. Subsequently Feeley, one of the plaintiffs in the case cited, brought suit against the city to recover money which it was alleged he had been compelled unlawfully to pay for license fees for the privilege of running omnibuses. On the hearing the final decree in the case of *Mayor* v. *Dehoney* was admitted in evidence in behalf of the plaintiff. This was held to be error, and the court, through Chief Justice Jackson, said: "It was an agreed or compromise verdict and decree, and that alone should exclude it; but it was not the same tax, not for the same year, not under the same ordinance, and how much it may have prejudiced the city's case we can not estimate." And in *Brady* v. *Pryor, 69 Ga.* 697, which was not a tax case, it was held, on the authority of Cromwell *v.* County of Sac, 94 U. S. 351, as to the effect of a judgment upon a subsequent action involving the same issues but a different, though similar, subject-matter, "that when an issue is in fact litigated and determined, such determination is conclusive upon parties and privies, in any subsequent action in which the same

issue is in question, though the subject-matter of the action be different. But to invoke successfully this rule, it must be shown that in the former action the issue was in fact litigated and decided. It is not sufficient that it was there so involved that it might have been litigated." Somewhat in point also is the case of *Worth* v. *Carmichael,* 114 *Ga.* 699, where it was held, that "where two notes were given upon a consideration arising in one and the same transaction, a judgment rendered in favor of the payee against the maker, upon one of such notes, did not operate to estop the latter from setting up, in a subsequent action brought by the former against him on the other note, a defense which was not in issue when the judgment was rendered."

As stated in Anderson's Law Dictionary, p. 157, jurists have found it difficult to define the term "cause of action." It is defined as: "The right which a party has to institute and carry through a proceeding. The act on the part of the defendant which gives the plaintiff his cause of complaint. . . A wrong committed or threatened." Id. "Matter for which an action may be brought." 1 Bouv. L. Dict., 295. "A 'cause of action' is the entire set of facts that gives rise to an enforceable claim; the phrase comprises every fact which, if traversed, the plaintiff must prove in order to obtain judgment." 1 Stroud, Jud. Dict. (2d ed.) 275. See also *City of Columbus* v. *Anglin,* 120 *Ga.* 775 (3). If, as indicated by the definition given by Bouvier, the subject-matter of the suit be the cause of action, there is no room for doubt that the present suit is on a different cause of action from the one instituted in the Federal court, except in so far as it seeks to enjoin the collection of taxes for the year 1900; and this view seems to be in harmony with the great weight of authority in tax cases. Identity of principles involved does not give rise to an estoppel by judgment. It may be controlling as precedent in the decision of the later case; but it does not cut the losing party off from a hearing in court. If such were not the case, to adopt the illustration given in the Kentucky case of Newport *v.* Commonwealth, which has already been cited, a man charged under two indictments for exactly similar offenses against the same penal statute would be cut off, after conviction under one indictment, from setting up any defense under the other. Confusion on this subject, we think, is doubtless responsible for the later decisions of the Supreme Court of the United States to which

reference has already been made. Our conclusion is that as to the taxes for the year 1900 the Georgia Railroad is now estopped; for all of the grounds of attack now made on the validity of the tax were, or might have been, urged on the trial in the Federal courts; but as to the taxes for the remaining years between 1883 and 1904, inclusive, it may insist upon all of the grounds for injunction contained in its petition.

3. It is contended broadly by counsel for the plaintiff in error that shares of stock in a foreign railroad company, whose line of road lies outside this State, are not taxable in Georgia; and they rest this contention upon the decision in *Wright* v. *Southwestern R. Co.,* 64 *Ga.* 783, where (p. 799) it was held that stock in railroads without the limits of this State is not taxable here, and that "stock in a railroad is really but so many shares of its property, and that property is real estate, for the most part at least, and taxable by the State in which the road is located." Counsel for the comptroller-general in their brief refer to the language quoted as a "dictum" of Mr. Justice Jackson, who delivered the opinion, and contend that the decision was ill-considered and unsound. It is not contended, however, that the language was obiter, or that the question decided was not necessarily involved in the decision of the case. A careful study of the opinion, as well as of the original record in that case, convinces us that the point was necessary to the decision; and however ill-considered, unsound, or unsupported by authority it may have been, it was the solemn judgment of a full bench, having, until overruled by a later decision or altered by legislative enactment, the force of a valid statute. See *Heard* v. *Russell,* 59 *Ga.* 54. The decision was not so much one of taxation or exemption; for, as pointed out in the able brief of counsel for the plaintiff in error, the tax act of 1874, with which the decision had to deal, required that all the property of railroads should be taxed; nor (though the language of the opinion might be considered susceptible of a different construction) did it decide that stock of a railroad or other corporation is not property, for at the time the decision was rendered there was in existence a statute, which is still of force, expressly declaring stocks representing shares in an incorporated company holding lands, or a franchise in or over lands, to be personalty. *Wright* v. *Southwestern R. Co.* adjudicated merely that the situs of stock in a railroad company whose road

lies outside the State of Georgia is in the State where the road lies. But by an act approved October 20, 1885 (Acts 1884-85, p. 30), the General Assembly very effectually and emphatically upset the doctrine of that case by declaring (sec. 2) that "personal property shall be construed, for purposes of taxation, to include . . all stocks and securities, whether in corporations within this State or in other States, owned by citizens of this State, unless exempt by the laws of the United States or of this State." It follows that if this act was valid and binding, the doctrine of *Wright* v. *Southwestern R. Co.* ceased to be the law of this State from the date of its passage.

4. It is insisted, however, that the act of 1885 was unconstitutional, in that it contained matter different from that expressed in its title, and, as persuasive evidence of that contention, it is pointed out that in compiling the Code of 1895 the codifiers left out the second section of the act, though other portions of the act were codified. The title of the act is as follows: "An act to provide for the correct returns of the property in this State for the purpose of taxation, and for other purposes." The body, so far as it relates to this discussion, has already been set out in the preceding division of this opinion. It is well settled that "provisions germane to the general subject-matter embraced in the title of an act, and which are designed to carry into effect the purpose for which it was passed, may be constitutionally enacted therein, though not referred to in the title otherwise than by the use of the words 'and for other purposes.'" *Banks* v. *State,* 124 *Ga.* 15 and cit. The general subject-matter embraced in the title of the act now under consideration is to provide for the correct returns for taxation of the property in this State. Certainly the ascertainment of what constitutes different classes of property, so as to facilitate the making of correct returns, is germane to that general subject-matter; and we do not hesitate to hold that the attack made upon the constitutionality of the act is without merit.

5. It is further contended, however, that by reason of the fact that this section of the act of 1885 was not incorporated in the Code of 1895, it has been repealed by implication; and in support of this position the cases of *Central R. Co.* v. *State,* 104 *Ga.* 831, and *Barnes* v. *Carter,* 120 *Ga.* 895, are cited. Those decisions merely held, as was inevitable, that by the adoption of the Code of 1895,

all prior *conflicting* laws were repealed by implication; but they did not go to the length of holding, nor do we know of any authority to that effect, that by the adoption of the code any previously adopted valid and constitutional law, not in conflict with anything contained in the code, was wiped out. It would indeed be an extreme view to hold that the codifiers, whose duties do not require them to pass on the constitutionality of legislation, might, because they considered a certain law unconstitutional, or even through mere oversight, by omitting it from the code put at naught the solemnly-expressed intent of the legislature; and it would be equally illogical to hold that the enactment of a code of laws carried with it by implication the repeal of other valid laws in complete harmony with the contents of the code. As the second section of the act of 1885 is not in conflict with any of the laws enacted in the adoption of the Code of 1895, we rule that it is still the law of Georgia.

6. There is no arbitrary classification of shares in a foreign railroad corporation for taxation in this State. Shares in domestic corporations are taxed, not in the same manner, but to a like extent with shares in foreign corporations. They are taxed indirectly, through the taxation of the corporation. It is the aim of the State to tax these shares once only in this State—in the case of domestic corporations they are taxed through the medium of the corporate property, while in the case of foreign corporations, where the corporate property can not be reached, the shares themselves are directly taxed. That this is lawful, and is not a denial of the equal protection of the laws guaranteed by the constitution of the United States, is abundantly established by authority. Kidd *v.* Alabama, 188 U. S. 730; Wright *v.* Louisville & Nashville R. Co.. 195 U. S. 219.

7. Nor is this system of taxation in violation of the provision of the Georgia constitution that "all taxation shall be uniform upon the same class of subjects, and ad valorem on all property subject to be taxed within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." This question was squarely decided adversely to the contentions of the railroad company in the case of Wright *v.* Louisville & Nashville R. Co., 195 U. S. 219, and the reasoning of Mr. Justice Holmes, of the Supreme Court of the United States, on that subject, seems to the writer in every way convincing. The case of Burke *v.* Bad-

39

lam, 57 Cal. 594, is also very strong authority for the position I now take. In that case it appeared that the constitution of California contained provisions very similar to those in our own constitution in regard to taxation. By the organic law "stocks" and "franchises" were declared to be included in the definition of the word "property," and it was provided that all property should be taxed in proportion to its value. It was held that when the corporate property of a company was taxed, this was in effect a taxation of the stock of the corporation also, and that the stock was not liable for separate and additional taxation. Said Ross, J., who delivered the opinion: "What is the stock of a corporation but its property—consisting of its franchise and such other property as the corporation may own? Of what else does its stock consist? If all this is taken away, what remains? Obviously nothing. When, therefore, all of the property of the corporation is assessed—its franchise and all of its other property of every character—then all of the stock of the corporation is assessed, and the mandate of the constitution is complied with." But, it is argued, applying this reasoning to the case in hand, the property of the Western Railway of Alabama is taxed in the State of Alabama, and to subject the shares of stock to taxation in Georgia is to place upon the owner of the shares the burden of double taxation. The answer to this argument, as is pointed out in the case of Wright *v*. Louisville & Nashville R. Co., supra, is that the Georgia authorities are bound to tax all property found in Georgia; the shares of stock in the foreign corporation are property, and therefore must be taxed; the corporate property not being situated in Georgia, and it being impossible, therefore, to tax the stock through the medium of the corporate property, the only thing left to the Georgia authorities is to tax the stock directly, as is done in the present case. The Georgia authorities have exacted no double taxation. The fact that Alabama has placed upon the corporate property a tax may work a hardship upon the holder of the stock, but it is not a reason why the mandate of the constitution that all property within the limits of the State not exempted shall be taxed should be disobeyed or disregarded.

A majority of the court, however, do not think that a decision as to the taxability of domestic stock is necessary in this case. This view is as follows: The constitution declares all property subject to taxation except such as the General Assembly is therein specifically

permitted to exempt.　It is not necessary to decide whether shares of a domestic corporation in the hands of a stockholder are required to be taxed as such, in order to comply with the uniformity clause of the constitution.　If it is necessary to tax them as such, there is no statute of which we are aware which has the effect to prevent the collection of the tax.　Nor are we called upon to decide whether, if domestic shares are taxable, it would be double taxation to assess them for taxation in the hands of the shareholder and also include them in the return made by the president of the corporation as provided by law, and, therefore, if the demands of the constitution would be satisfied by the indirect tax of the shares in the assessment on the corporate return.　The precise question presented in this phase of the matter is, whether the uniformity clause is offended by the imposition of a tax on foreign shares.　The constitution, with regard to declaring what property is liable for taxation, is self-executing.　If the legislature, in the scheme for levying and collecting taxes, does not exempt or attempt to exempt property constitutionally liable for taxation, it is no objection that the tax levy is not uniform on the subjects of taxation because in the administration of the law certain property may escape taxation because of the delinquency of the tax officers.

8. In further support of the contention that in the levy of these taxes the railroads were denied the equal protection of the laws, it was claimed that only the Georgia and Central Railroads had been proceeded against for back taxes on shares in non-resident corporations, and that other owners of such foreign shares were not required to pay either present or past-due taxes thereon.　In support of this claim affidavits of some forty tax-receivers of different counties in the State were introduced in evidence to show that during their respective terms of office the owners of shares of stock in foreign corporations residing in Georgia had not returned said stock for taxation, and that it had been the uniform practice of the tax-receivers not to require them to return such stock.　The record discloses that "it was admitted that the Georgia Railroad and Banking Company and the Central of Georgia Railway Company were the only persons owning foreign railroad stock proceeded against for taxes on these kinds of shares.　The comptroller-general's statement that he knew of no other delinquent was also admitted."　Certainly on this showing the court below was authorized to find that

there had been no such unequal and discriminating administration of the taxing laws as to amount to a denial to the railroad com- panies in question of the equal protection of the laws. Affidavits from tax-receivers of less than one third of the counties of the State, coupled with an admission that the comptroller-general had proceeded against the only delinquents who had been brought to his notice, certainly can not be said to establish that the policy of the State has been and is to single out these two railroads, or railroads as a class, as the only citizens who are to be required to pay taxes on shares of stock in foreign corporations. Clearly there is no merit in this contention.

9. On January 27, 1905, the comptroller-general wrote to the president of the Georgia Railroad and Banking Company the fol- lowing letter: "The Supreme Court of the United States having recently held, as you doubtless are aware, that the shares of stock of the Western Railway of Alabama owned by the Georgia Railroad and Banking Company are taxable in Georgia, it becomes my duty to assess these shares of stock for taxation for each of the years in which they are in default for their taxes. This assessment is re- quired to be made by the comptroller-general from 'the best in- formation obtainable.' I desire to proceed to the discharge of this duty intelligently, and therefore respectfully request you to furnish me any data in your possession which will enable me to make per- fectly fair, just, and legal assessments of this property. From your long connection with the property as President of the Georgia Rail- road and Banking Company, and your familiarity with its value, you doubtless are in possession of information which will very greatly aid me in making an equitable assessment of the property. I trust, therefore, you will submit at your earliest possible conven- ience any facts or suggestions bearing upon this line which you may deem proper. I would be glad to have any data which you may sub- mit with reference to its value for each year beginning with the year 1883, the year I am informed your corporation became the owner of these shares of stock. I expect to proceed with this matter some time the early part of next week if possible." Other correspondence took place between the comptroller-general and various officers of the Georgia Railroad, including the general counsel, who eventually submitted to the comptroller-general a statement regarding what he considered the value of the railroad property in question, together

with a tabulated statement of the dividends which the Georgia Railroad had received from the stock; at the same time protesting that the stock was not liable for taxation, and refusing to make any return of it for that purpose. The comptroller-general thereupon, according to his affidavit, "assessed the same from the best information obtainable." It is insisted with great earnestness and ability that the levy of executions under these circumstances, without giving notice to the railroad company or allowing it any opportunity to be heard as to the basis of valuation upon which the assessment was made, amounted to a seizure of its property without due process of law. It is not claimed that the comptroller-general has violated the provisions of any existing statute, but that the laws of Georgia do not provide for the collection of taxes on omitted property after a return has been made by the taxpayer and accepted by the comptroller-general.

The Political Code, §812, prescribes the method by which "corporations, companies, persons, agencies, or institutions" shall make returns of their property to the comptroller-general for taxation, and provides that "such returns shall be carefully scrutinized by the comptroller-general, and if in his judgment the property embraced therein is returned below its value, he shall assess the value, within sixty days thereafter, from any information he can obtain, and if he shall find a return of . . matters required to be returned as aforesaid, below the true amount, or false in any particular, or in any wise contrary to law, he shall correct the same and assess the true amount, from the best information at his command, within sixty days. In all cases of assessment, or of correction of returns, as herein provided, the officer or person making such returns shall receive notice and shall have the privilege, within twenty days after such notice, to refer the question of true value or amount, as the case may be, to arbitrators, . . and their award shall be final." Section 813 is as follows: "In cases of failure to make return, the comptroller-general shall make an assessment from the best information he can procure, which assessment shall be conclusive upon said corporations, companies, persons, agencies, or institutions." By section 814 it is provided that "In all cases of default of payment of taxes upon returns or assessments, the comptroller-general shall enforce collections in the manner now provided by law." "If any corporation, company, person, agency, or institution, who are

required to make their returns to the comptroller-general, shall fail to return the taxable property or specifics, or pay annually the taxes for which they are liable to the State treasury, the comptroller-general shall issue against them an execution for the amount of taxes due, according to law, together with the costs and penalties." §874. "When there is no return by which to assess the tax, the comptroller-general shall, from the best information he can procure, assess in his discretion." §879. These sections of the Political Code are thus set out in order that we may have before us at the outset the various statutes bearing on the power of the comptroller-general to, collect taxes on property which has not been returned. And at this point we will take occasion to say that in our opinion all considerations of the good faith of the railroad company should be eliminated from this discussion. It may be conceded that the officials of the company honestly believed that this stock was not taxable, and that there has never been on their part the slightest effort to conceal the Georgia Railroad's ownership of it, or to deceive the comptroller-general in any way. In no jurisdiction has the maxim "ignorantia legis neminem excusat" been more rigidly applied than in Georgia. The railroad company was bound to know that this stock was taxable, and its mistaken, though honest, belief to the contrary furnishes no excuse for non-payment. The sole question now to decide is, whether or not the steps taken by the comptroller-general to enforce the collection of the tax are legal.

A question of vital importance is whether sections 813 and 874, entitled respectively, "When no return, comptroller to assess," and "Defaulting corporations," have reference only to a total failure on the part of the citizen to make a return, or extend to cases where there has been a return which only partially sets out the property of the taxpayer. The latter contingency is certainly not covered by section 812, which has reference, not to an incomplete return, but to an insufficient valuation by the taxpayer. It must be borne in mind that tax laws are to be construed liberally in favor of the power of the State to tax. 27 Am. & Eng. Enc. L. (2d ed.) 699 and note; Board of Commissioners *v.* Anderson, 68 Fed. 341. In our opinion the only rational construction to be placed on sections 813 and 874 of the Political Code is that they cover as well a partial as a total failure to make returns. Any other construction would lead to a manifest absurdity, and would place the State at the mercy of the

tax-dodger, who, by returning at its full value a mere tithe of his property, would thus escape taxation on the bulk of his estate.

10. The same reasoning is applicable to the contention that by an acceptance of the return on the part of the comptroller-general the transaction is closed, and can not be reopened by the taxing officers. Such a holding would place a premium on deception, would deny the right of the State to correct mistakes for which its officers were not responsible, and would, in effect, give to the acceptance of a tax return the solemn and binding effect of a judgment fixing the amount of taxable property owned by the taxpayer. "An assessment is not a judgment within the doctrine of res judicata, and does not bar or estop a supplemental assessment of property which was, in fact, erroneously omitted, even though its omission in the first instance was the result of a decision by the officers making the regular assessment, holding it to be exempt." 27 Am. & Eng. Enc. L. (2d ed.) 701; Sturges v. Carter, 114 U. S. 518. Whatever may be the binding effect of the acceptance of returns by the tax officer in a matter involving judicial action (24 Am. & Eng. Enc. L. 723), it can not be claimed that the ascertainment whether the returns accepted embrace all the property owned by the citizen is a judicial act. The fallacy of the "closed book" theory is shown, we think, by section 855 of the Political Code, which provides that "Receivers and collectors are required to receive the returns and to collect the taxes thereon for former years, when any person is in default, which taxes shall be assessed according to the law in force at the time the default occurred, and shall be so specified in the digest." It is true that this section in terms refers only to tax-receivers and tax-collectors, and does not mention the comptroller-general of the State. But it must be borne in mind that the section was enacted into law in 1813, at a time when the comptroller-general was merely an auditor of public accounts, and had no powers as a taxing officer, and when all taxable property of every kind was returned to the tax-receiver and collected by the tax-collector. In 1861, for the first time, the comptroller-general was made a tax officer; and it is only reasonable to assume that in delegating to him certain duties which had hitherto been performed by the county officers, the General Assembly intended that he should be clothed with the same powers as they had for the complete and efficient discharge of those duties, so far as applicable. If we are correct in this

reasoning, the language of Judge McCay in his concurring opinion in the case of *Walker* v. *Whitehead,* 43 *Ga.* 551, 552, furnishes an irresistible argument for holding that the comptroller is not concluded by the acceptance of returns from making a subsequent assessment for omitted property.   Discussing what is now section 855 of the Political Code, it was said: "That [the taxes] were due five, four, three, and two years ago, and have gone unpaid, is no relaxation of the obligation to pay them.   Can it be contended that, because one in 1866 or 1868 managed to conceal his taxable property, he is thereby released from his obligation to pay the tax thereon when he finds it no longer possible to hide it?   .   .   These taxes are just as much due now as they were in the year they were incurred.   They are a present, subsisting, legal obligation, and if the remedies provided at the time have proved inadequate to enforce their payment, the State may take any new remedy that may suggest itself.   .   .   The duty to pay exists *now,* it is a continuing, present obligation and duty, just as imperative to-day as it was last year.   The 866th section of the Code [now Pol. Code, § 855] provides how taxes for previous years shall be given in and paid, and one who to-day fails to give in and pay taxes upon property not given in and paid in former years, fails in a *present* duty, and it is perfectly competent to affix a penalty on him, not for his past, but for his present and future failures."

Again, by the act of 1813 (Pol. Code, § 847), it is provided that if a person fails to make a return, in whole or in part, it is the duty of the receiver to make the valuation and assess the taxation thereon, and in all other respects to make the return for the defaulting person from the best information he can obtain; while by the act of 1804 and its amendments (Pol. Code, § 949, par. 2, 11), it is made the duty of the tax-collector "to search out and ascertain as far as possible all polls and professions, and all taxable property not returned to the receiver or not found in his digests," and "to issue executions against all tax defaulters who are residents of the counties in which said tax-collectors are holding their offices, for any and every year preceding and including the years for which they are elected, and to collect the tax due from said defaulters, and pay over the same to the proper authorities."   Reading together the provisions of sections 847 and 949, and all of the provisions of the code on the subject of the collection of taxes, the conclusion is

necessarily reached that there was a legislative intent to clothe the comptroller-general as a tax-receiver and collector with all the powers of the county receiver and collector, wherever applicable to his duties in these capacities, whether the law conferring these powers was in force when the comptroller-general first became a tax officer, or were thereafter enacted.

11. The Georgia law affords to every citizen, individual or corporate, ample facilities for the preservation of his rights as against the tax-gatherer, always provided that he makes a return to the proper officer of the property that he owns. It presupposes that the taxpayer will disclose to the officer all of his taxable property, and it requires him to know whether his property is taxable or not. The requirement of candor in disclosing the ownership of property is really at the foundation of our tax system. So long as the citizen complies with that requirement, he is afforded every opportunity to dispute with the State the question of the value of his property and the amount of tax to be levied thereon. When he fails to return, in whole or in part, fraudulently or through an honest mistake, he then and there becomes a defaulter, and the door of opportunity is closed to him, so far as the right to have the mutual rights between himself and the taxing power adjusted by arbitration is concerned. In other words, ample "machinery" is available to the citizen who makes full returns; deprivation of the right to be further heard is one of the penalties visited upon the defaulter. The collecting officer must ascertain as best he can the amount of property to be taxed, as well as its value, and take summary means for its collection. This, it seems to us, is the scheme of taxation contemplated by the laws of this State. Whether or not it is consistent with a wise public policy we do not undertake to determine. That it is not unconstitutional we are fully satisfied. 1 Cooley on Taxation, 619-624, and cases cited in notes; Board of Commissioners v. Anderson, 68 Fed. 341; Lott v. Hubbard, 44 Ala. 593; McMillan v. Carter, 6 Mont. 215, s. c. 9 Pac. 906; Orena v. Sherman, 61 Cal. 101; Tucker v. Aiken, 7 N. H. 113; City v. Champion, 58 Conn. 268, s. c. 20 Atl. 471; McTwiggan v. Hunter (R. I.), 29 L. R. A. 526; Board of Revenue v. Montgomery Gas Light Co., 64 Ala. 269; Wabash R. Co. v. Johnson, 108 Ill. 11; Siegfried v. Raymond, 190 Ill. 424; Goodman v. Halter (Ind.), 47 N. E. 665; Hagar v. Reclamation District,

111 U. S. 701; Pittsburgh R. Co. *v.* Backus, 154 U. S. 426; *Du-Bignon* v. *Brunswick, 106 Ga.* 317.

12. As we have seen, the comptroller-general in making his assessment was only obliged to use "the best information he could procure" as the basis of his valuation of the property taxed. There is nothing in the record to indicate that upon that basis the valuation placed upon the shares by the officer was excessive.

13. It can not avail the railroad company that during all the years for which the tax now under consideration was levied it had issued annual statements showing its possession of the shares of stock now sought to be taxed, and that the comptroller-general might have ascertained from these statements, which were easily accessible to him, the Georgia Railroad's ownership of the shares. "Estoppels against the State are not favored; and though they may arise from its express grants, they can not arise from the laches of its officers, since persons who deal with an officer of the government are bound to know the extent of his power and authority." Lott *v.* Brewer, 64 Ala. 287.

14. In the absence of a statutory provision to that effect, taxes do not bear interest. *State* v. *Southwestern Railroad, 70 Ga.* 32(8). Section 887 of the Political Code, providing for the payment of interest on tax fi. fas., was not approved until November 11, 1889, and consequently the comptroller-general can not lawfully exact interest on taxes accrued prior to that time. Under the statute cited the interest dates, not from the time of the issuing of the fi. fa., but "from the time fixed by law for issuing the same." "Such interest is not in the nature of a penalty." *Sparks* v. *Lowndes County, 98 Ga.* 284.

15. The assessment made on the stock for the year 1883 (which was identical with those made for the other years involved in this litigation, except as to dates and amounts) was in the following language: "Whereas The Georgia Railroad and Banking Company, a corporation chartered under the laws of Georgia and doing business in this State, having failed and refused to return for taxation, for the year 1883, 15,000 shares of stock of the Western Railway of Alabama, an Alabama corporation, said stock being then held and owned by said Georgia Railroad and Banking Company in this State, and having failed and refused to pay the taxes due the State thereon for the year 1883 as required by law, I hereby assess

the said 15,000 shares of stock of the Western Railway of Alabama for said year as being then of the value of $1,350,000.00. Said assessment being made by virtue of authority vested in me by law as Comptroller-General, 'from the best information I can procure.' " In the light of what we have held in a preceding division of this opinion in regard to the contention of the plaintiff in error that the levy is a seizure of its property without due process of law, it is only necessary to add that the assessment which has been quoted showed every jurisdictional fact necessary to authorize the comptroller-general to proceed thereunder.

16. It is insisted by counsel for the plaintiff in error that in the years 1903 and 1904 the Georgia Railroad actually made a return of the stock owned by it in the Western Railway of Alabama, though under protest, and that, this being so, the comptroller-general had no right, until after compliance with the provisions of the Political Code, §812, to increase the amount of the return. As it appears from the record, however, that this so-called "return" was merely a statement "for the purpose of furnishing the office of the comptroller-general with information sought by said office, and not for the purpose of making a return of property for State taxation," there is obviously no merit in this contention.

17. But it is urged that the claim of the State for these taxes is barred by the statutes of limitation; and this contention is based on several different grounds. The Civil Code, §3777, provides that "When, by the provisions of the foregoing sections [§§3760 to 3776 inclusive], a private person would be barred of his rights, the State shall be barred of her rights under the same circumstances." This section became a part of the law of Georgia in 1856 (Acts 1856, p. 237). Up to that time the maxim nullum tempus occurrit regi obtained in Georgia. *Brinsfield* v. *Carter, 2 Ga.* 143; *Moody* v. *Fleming, 4 Ga.* 116(7); *Smead* v. *Williams, 6 Ga.* 159. The act of 1856 is plainly in derogation of the common law and of the rights of the State, and, under the well-established rules, must be given a strict construction. In terms it is limited to the "foregoing sections," that is, the preceding sections of the chapter relating to the general subject of limitations; and therefore it will not be extended to bar the right of the State to any actions not provided for by those sections of the code.

18. But it is contended that section 3775 is applicable to this

case, and that by the terms of section 3777 the State is barred by the provisions of the section first mentioned. That section is as follows: "The limitations herein provided apply equally to all courts; and in addition to the above, courts of equity may interpose an equitable bar, whenever, from the lapse of time and laches of the complainant, it would be inequitable to allow a party to enforce his legal rights." This contention is plainly founded on a misconception of the equitable doctrine of stale demands. The principle that a stale demand will not be enforced is peculiarly applicable to equity practice, is available to the defendant only, and can not be employed by the complainant in an equitable proceeding to enjoin the enforcement of a purely legal right. Indeed, by the terms of the statute cited, it is restricted to cases where the "complainant" has been guilty of laches and time has elapsed to make his claim inequitable. See also Bisph. Pr. Eq. (6th ed.) §39.

19. Section 3768 of the Civil Code is also pleaded in bar of the State's right to collect these taxes. That section is as follows: "All actions upon open account, or for the breach of any contract not under the hand of the party sought to be charged, or upon any implied *assumpsit* or undertaking, shall be brought within four years after the right of action accrues." The principal authority relied on by counsel to support the contention that this section covers a claim by the State for taxes is the case of Bristol v. Washington County, 177 U. S. 133; 148. That case went to the Supreme Court of the United States from Minnesota, and was decided on the authority of the case of County of Redwood v. Winona Land Co., 40 Minn. 512 (also cited as State v. Lands in Redwood County, 42 N. W. 473), in which case the Minnesota court held, that by statute in that State the statute of limitations ran against the State the same as against an individual; that a tax was a liability created by statute, and that under a law providing that actions upon a liability created by statute should be barred after six years the State could not put in motion the legal machinery provided by statute for the collection of back taxes after that time. There is a vast difference, however, between a liability created by statute and an open account, a contract not under the hand of the party sought to be charged, or an implied assumpsit or undertaking. The statute passed upon by the Minnesota court, and later by the Supreme Court of the United States, is more closely analogous to section

3766 of our Civil Code, which provides that "all suits for the enforcement of rights accruing to individuals under statutes, acts of incorporation, or by operation of law, shall be brought within twenty years after the right of action accrues;" and if that section were before us for construction, the cases cited would be very strong authority for the proposition that the State's claim for taxes will be barred after the lapse of the period therein mentioned. In view of the fact, however, that we have already decided, independently of statutes of limitation, that the tax involved in this case can not be collected except for a period of less than twenty years prior to the institution of this action, any ruling with reference to section 3766 of the Civil Code would be obiter, and manifestly out of place. Nevertheless the writer will take occasion to say that his personal opinion is that under section 3766 of the Civil Code, read in connection with section 3777, and on the authority of the cases of Bristol v. Washington County, 177 U. S. 133, and State v. Lands in Redwood County (Minn.), 42 N. W. 473, the State is barred of its right to collect back taxes after the lapse of twenty years.

Taxes, however, are not debts within the meaning of the Civil Code, § 3768. "A tax, in its essential characteristics, is almost universally held not to be a debt or in the nature of a debt. The distinction between a debt and a tax is that the one rests on the contract and the other does not. A debt is a sum of money due by contract, express or implied, while a tax is a charge on person or property to raise money for public purposes, and operates in invitum." 27 Am. & Eng. Enc. L. (2d ed.) 580, and cases cited in note. See also DuBignon v. Brunswick, 106 Ga. 325. With this distinction clearly in mind, we think there can be no doubt that section 3768 of the Civil Code does not raise any bar to the right of the State to collect back taxes.

20. Finally, sections 890 and 891 of the Political Code are relied on to bar the collection of taxes for more than seven years. My views on this subject are hopelessly at variance with those of a majority of my brethren. I incorporate herewith their views, and will then endeavor to make clear my reasons for dissenting therefrom.

"That invisible person, or power, or being, or entity, no matter what it may be called, which for convenience, under our system of government, we call the State, was endowed in the beginning of

republican institutions with many of the attributes of the visible king whose authority to rule was supposed to have its origin in divine right. The maxims that no time runs against the king, and that the king can do no wrong, were applied to the invisible ruler of modern institutions with somewhat the same force and rigor with which they were applied to the king of the olden days. But that which we call the State is also properly called the public and the people, and the invisible ruler becomes visible by simply opening the eyes to that mass of individuals with whom government originates and through whose representatives government is carried on. The State, that is the public, the people, the ideal sovereign of the more enlightened days of the world, in the steady recession from the selfish, not to say atrocious theory, that the subject exists for the benefit of the sovereign, and the latter has rights before which the interests and welfare of the former must pale and vanish,—in the steady advance in the revolution of thought that government is subordinate to the people, and instead of being their master is their servant, the State has voluntarily come under the operation of the statutes of limitation wholly and unreservedly in nearly every instance where such statutes are applicable to individuals.

"The general rule is that where an individual would be barred by a statute of limitations the State is likewise barred, under the same circumstances. The exceptions to this rule are few in number. The question now is whether the mere naked claim of the State for taxes which it has not sought to enforce by execution is barred by any statute of limitation. If the State has attempted to enforce its claim for taxes by execution, that the execution would become barred in the same time and under the same circumstances that an execution issued under an ordinary judgment would be barred is beyond question. Acts 1887, p. 23; Pol. Code, §890. The section of the code just cited provides: 'All State, county, city, or other tax fi. fas., before or after legal transfer and record, shall be enforced within seven years from the date of their issue; or within seven years from the time of the last entry upon the tax fi. fa. by the officer authorized to execute and return the same, if said entry is properly entered by said officer upon the execution-docket and books in which said entries are now required to be made in cases of entries on executions issued on judgments.' The section immediately following is in this language: 'All laws in

reference to a period of limitation as to ordinary executions for any purpose, or to the length of time or circumstances under which they lose their lien in whole or in part, are made applicable to tax fi. fas.' Pol. Code, § 891. We recognize the rule of construction that statutes derogatory to the sovereign right of the State shall be construed strictly in favor of such right, and that a statute imposing upon the State a limitation as to its sovereign right which is doubtful in meaning or equivocal in its terms must be so construed as to uphold the right and defeat the limitation upon its power. The State surrenders its sovereign right only by express enactment or necessary implication. It is therefore to be determined whether the legislative intent in the act of 1887 was to destroy the right of the State to claim a tax lien against the citizen after the lapse of a given time, or whether it was intended to destroy the mere process that might have been issued and leave a lien for taxes still existing for all time when no execution had ever been issued to enforce it.

"Statutes of limitation are statutes of repose. They are intended to relieve against the hardships inevitably incident to the enforcement of demands of long standing, when the lapse of time would necessarily place the person against whom they are enforced at a disadvantage as to their defenses. In interpreting the act of 1887, the purpose of such a statute must be kept prominently in view. Construing this act as a whole, its language indicates that the purpose of the lawmaking power was to place the State, in regard to its claim for taxes, in the same position that a plaintiff in a judgment would be placed as to the enforcement of a right upon which a judgment was founded. While the statute uses the word 'execution' and not the word 'judgment,' there can be no legitimate escape from the conclusion that the legislative intent was to bring the tax judgment of the State within the dormant-judgment law applicable to cases of individuals. The entries required to be made as tax executions are entries similar to those required to be made on 'executions issued on judgments.' That the word 'execution' is to be interpreted in the sense of judgment becomes clear when we refer to the statutes evidently referred to by the expression, 'All laws in reference to a period of limitation as to ordinary executions.' The only law to which this expression can apply is the dormant-judgment act embraced in the Civil Code, § 3761, the effect of which is to destroy the lien of the judgment upon which the execution is

based by a failure to enforce the execution, and not merely to de--stroy the execution itself. That section is in the following lan-guage: 'No judgment shall be enforced after seven years from its rendition, when no execution has been issued upon it and the .same placed upon the execution docket, or when execution has been is-sued and seven years have expired from the time of the record, upon the execution docket of the court from which the same issued, of the last entry upon the execution made by an officer authorized to exe--cute and return the same. Such judgments may be revived by scire facias, or be sued on within three years from the time they became dormant.' Unless this is the section referred to, section 891 of the ₀ Political Code is meaningless, because there are no laws in this. State in reference to a period of limitation as to ordinary execu-tions, but there is the law above quoted which is a period of limita--tion as to ordinary judgments. While it is to be conceded that the act of 1887 does not in terms declare that the judgment in favor of ' the State for taxes shall become barred, it is necessarily implied; and unless this implication is allowed to operate, the second section of the act is without meaning, and this anomalous situation arises: that the State is barred where its officers do their duty and issue · · their executions within due time, but fail to have entries made thereon from time to time as required by law, but the State is not. barred when there has been either a negligent or a wilful failure on. the part of the public officers to discharge their duties under the law. That part of section 3761 which declares that no judgment shall be · enforced after seven years from its rendition, when no execution has been issued thereon, is by necessary implication a part of the act of ' 1887, and hence when the State has failed to issue an execution for taxes within seven years after the time for the issuing of the execu-tion has arrived, the claim of the State for taxes is barred, and barred for the reason that in this particular the act of 1887 brings. the judgment of the State for.taxes within the full operation of the dormant-judgment act. See, in this connection, *Staten* v. *Railway Co., 111 Ga.* 803(2). For reasons satisfactory to the General As-sembly the right of the individual to have a dormant judgment re-vived within three years after dormancy has not been made a part of what we might properly call the dormant-tax-judgment act. To allow the State after the lapse of seven years to enforce by execution a claim upon a judgment for taxes upon which no execution had.

been issued would be as antagonistic to the law as to allow an individual to sue on a note under seal upon which a judgment had been rendered and had become barre<sup>?</sup> within less than twenty years simply for the reason that the original period of limitation applicable to sealed instruments had not expired at the time the judgment had become dormant. The analogy between the two is not altogether perfect, but it exists sufficiently to illustrate the anomaly resulting from the construction sought to be placed upon the act of 1887.

"There is no question of fraudulent concealment of property involved here. The same reasoning, that the lapse of four years did not bar the enforcement of taxes because the statute referred to suits, would likewise apply to section 3766, which reads that 'all suits for the enforcement of rights accruing to individuals under statutes,' etc., shall be barred within twenty years. Moreover, under the peculiar language of section 3766, and the construction put upon it by this court in *Bigby* v. *Douglas, 123 Ga. 635,* and in *Savannah Canal Co.* v. *Shuman, 98 Ga. 171,* it would seem not applicable here. In some courts it has been held that suits or proceedings in the nature of suits to recover taxes are like actions to enforce statutory rights, and should be barred accordingly, even though taxes be not mentioned in the statute at all. See what is said in the authority referred to by Mr. Justice Candler, County of Redwood *v.* Winona Land Company, 40 Minn. 525-6. If the bar does not attach either in four years or twenty years, then it either attaches to the enforcement of taxes by execution under the Political Code, §§ 890, 891, as to property alleged not to have been returned, or else no statute of limitations applies at all. If no statute applies, then there is no limit beyond which the comptroller-general or tax-collector may not go in issuing fi. fas. It is not a mere question as to the taxes of this corporation. The amount involved in this case is of small importance compared to the establishment of correct rules of law as to taxpayers. Every property owner in the State is subject to taxation; and if the tax-collector can go backwards without limitation, and declare that any taxpayer owned certain property at a given date and failed to return it, assess its value from the best information he can obtain, adding interest, and issue execution therefor, it presents a serious question for all the taxpayers of the State. If any other construction were made than that which we

.give to the statute, few men in the State could feel safe that the
titles to their homes and lands might not be subjected for some
·omission (accidental or intentional) from the tax returns of some
former owner (many years ago perhaps), for which no claim had
been made, and no execution issued.   Liens attach for taxes, not
from the date of the execution, but from the tax day fixed by the
law.   A sale to an innocent purchaser even does not divest them.
The former owner might have honestly believed the property not re-
·turned was not subject to taxation, but this would not save the pres-
·ent owner, unless there is some limitation.

"A construction which would place no limitation upon the right
·of the tax-collector to issue and enforce fi. fas. would mean public
·disaster.   Tax is a valuable and necessary thing for the State, but
the security of the citizen is also good.   There may be 'tax dodg-
·ers,' and men who defraud the government, but tax liens affect the
honest as well as the dishonest.   Without irreverence, the State in
·general laws seeks to follow the Divine example, when it is said:
'.He maketh His sun to rise on the evil and the good, and sendeth
rain on the just and unjust.'   The laws of this State taxing prop-
·erty are uniform.   Of course, if the law is plain, we must adminis-
ter it and not change it, whatever may be the result.   But it is well
recognized that in construing a statute the court may look to the
·old law, the mischief, and the remedy; and with this in view, the
legislative intent in making the laws relating to ordinary executions
·and judgments becoming dormant, applicable to tax executions,
·should be considered.   If the law is not clear, the reasonableness or
·unreasonableness of a particular construction is a legitimate sub-
ject for consideration.   *Lombard* v. *Trustees,* 73 *Ga.* 322; *Moravian
Seminary* v. *Atwood,* 50 *Ga.* 382; 26 Am. & Eng. Enc. L. (2d ed.)
·646.   Is it reasonable to suppose that the legislature meant to pro-
tect purchasers only if the tax-collector had done his duty and issued
execution, but left them in danger and with an overhanging lien,
for an unlimited time, if he did not issue an execution?   True
there is no intervening purchaser here.   But under the statute there
is no distinction; and if there is no bar as to the defendant, there
is none as to a purchaser, however honest.   Furthermore, the legis-
lature has declared that interest against a taxpayer runs from the
time when an execution should have been issued, and this has been
construed to mean December 20, of each year.   Surely the State did

not intend to fix a date when its officer should have issued the execution as a point from which interest should run against a taxpayer, but not from which the statute of limitations should run in his favor. Doubtless the legislature considered the serious consequences resulting from thus leaving the matter open for action by the tax-collector indefinitely, when they passed the act of 1887, embodied in the sections of the Political Code cited above. If this be not the correct construction, in examining titles no lawyer could give his client any assurance that he would obtain a clear title; for if there were no limitation, the danger would go back to the beginning of the taxing system.

"The constitutional prohibition against granting away the right of taxation (Civil Code, § 5796) has no relevancy, we think, to the case. The constitution prohibits the grant of privileges and exemptions (except as specified) to corporations and other persons. It says nothing of the time when the execution must be issued or enforced. The legislature has passed many acts prescribing the time within which actions may be brought, but these were not considered unconstitutional violations of property or property rights. A similar question has been passed on by the Supreme Court of Montana, in Board of Comm'rs v. Story, 69 Pac., 56."

With the greatest respect for the profound ability and learning of my brethren, I am constrained to register a very earnest dissent from the views above expressed. Their vigorous attack upon the inherent fallacy of the obsolete doctrine of the divine right of kings, and the scholarly narrative of the evolution of human thought resulting in the rejection of this fallacy by advanced and enlightened nations, are both entertaining and instructive; but I fail to see that they illuminate the subject under discussion. It is freely conceded that the theory that the subject exists for the benefit of the sovereign is both "selfish" and "atrocious,"—it might be even more strongly characterized. I must insist, however, that this theory is not even remotely kin to the one that the right of self-preservation is inherent in the State, be it republican or monarchical in form, and that growing out of this right as a necessary incident thereto is the right to tax the citizen for the support of the government. "The right of taxation is a sovereign right, inalienable, indestructible,—is the life of the State." I do not contend for the divine right of kings, but for the inherent, if not divine, right of the State (i. e., the

people) to protect and perpetuate itself.    The right to tax can not be abridged or restricted in any degree without the consent of the State, and that consent must be so plainly expressed as to leave no room for doubt.    I dispute the theory announced by the majority that "the general rule is that where an individual would be barred by a statute of limitations the State is likewise barred under the same circumstances," and contend that the exception has been stated instead of the rule.

In my opinion, section 891 of the Political Code was designed to render tax executions dormant in the same manner that executions issued on judgments become dormant.    I agree with the contention of counsel for the State that the purpose of the statute is to protect innocent and bona fide purchasers.    *Stanley* v. *McWhorter, 78 Ga. 38; Hollis* v. *Lamb, 114 Ga. 744; Easterlin* v. *New Home Co., 115 Ga. 309.*    And I can conceive of no rule of construction by which there can be read into section 891 the meaning that unless a claim for taxes is placed in execution within seven years from the date of its accrual, the State will, by analogy to the case of one who has obtained a civil judgment which has not been placed in execution, lose the right to issue a fi. fa. and enforce its collection.    The argument that the construction of sections 890 and 891 for which I contend would place a premium on official inaction and allow the State to derive an advantage from the negligence of its taxing officers is to me entirely unconvincing.    All presumptions are in favor of the faithful and efficient discharge of their duties by officers.    On the other hand, the contrary construction will place a premium on concealment, deception, and tax-dodging, which, in human experience if not in human nature, are evils more to be dreaded and more likely to be encountered than official inaction.

As has been seen, a majority of the court is of the opinion that the State's right to issue execution for taxes is barred after the lapse of seven years from the time when the right to issue such execution accrues.    We are, however, unanimous in holding that the statute did not run against the State during the time that the comptroller-general was enjoined by the Federal court from issuing any fi. fa. whatever for taxes on this stock.    As will be seen from another portion of this opinion, the only question necessarily involved in the suit in the United States circuit court was the taxability of the stock for the year 1900; and to that extent only does the estoppel by

judgment operate. But the decree in the case enjoined the issuance of any executions for taxes, not only for taxes for the year 1900, but for subsequent years, and for any year in which the State might see fit to make a claim for taxes on the stock. While neither party is estopped on the question of taxability, except for the year 1900, the hands of the State officers were absolutely tied by the injunction as to the enforcement of any claim for taxes which the State might have. In this litigation the Georgia Railroad and Banking Company was a party; and while it was not a complainant, and did not itself procure the decree, it was a party to the case and was bound by the decree to the same extent that other parties would be bound, and was actually enjoined from returning or paying any taxes whatever on this stock. With the State officers in the situation in which the final decree left them, they would have been in contempt of court if they had attempted to enforce any claim for taxes against this stock in any way for any year. Under such circumstances the plaintiff in the present case can not in equity ask that the State be barred by a limitation of time, when the time involved is that which passed during the period when the State officers were bound to remain passive as a result of a judgment of a court of competent jurisdiction.

Mr. Justice Lumpkin concurs with me in the conclusion that I have reached, but, as will be seen, some of the reasoning leading thereto conflicts with the position taken by him in his dissenting headnote, 2 (a).

On the main issues of the taxability of the stock in question and the legality of the procedure instituted by the comptroller-general, the court below was right; and therefore the judgment will be affirmed; direction being given, in accordance with the views of the majority, that the comptroller-general and the sheriff be enjoined from seeking to collect any tax on the stock from the plaintiff in error which accrued prior to the year 1895, and that the costs incurred in bringing the case to this court be taxed against the defendant in error.

*Judgment affirmed, with direction. All the Justices concur, except Candler, J., who dissents as to the direction given.*