A97A1567. ECKERD CORPORATION v. COWETA COUNTY
BOARD OF TAX ASSESSORS.
(491 SE2d 173)

ELDRIDGE, Judge.

Appellee Coweta County Board of Tax Assessors ("Tax Board") audited appellant Eckerd Corporation's ("Eckerd") ad valorem personal property tax returns for a three-year period, 1992 through 1994. Pursuant to the audit, the Tax Board determined that Eckerd had undervalued its inventory, equipment, furniture, and fixtures in these returns and, subsequently, seeks taxes thereon. Eckerd filed a motion for summary judgment, claiming that it had paid its assessed taxes for the years in dispute and that the Tax Board was attempting to reassess and revalue property for which returns had been filed and the taxes had been paid, which practice is allegedly improper. The Superior Court of Coweta County denied appellant's motion. We granted Eckerd's petition for interlocutory review and now affirm the ruling of the trial court. In so doing, we make clear three specific points regarding our Ad Valorem Tax Code, OCGA § 48-5-1 et seq., in regard to taxation of tangible personalty.

1. If an audit uncovers a taxpayer's undervaluing of returned personalty for ad valorem tax purposes, the subsequent tax bill covering the shortfall is *not* a reassessment or revaluation of the returned units of property, but a bill for the "default" as to that portion of the personalty not represented through the undervaluation. *Garr v. E. W. Banks Co.*, 206 Ga. 831 (59 SE2d 400) (1950); see also *Hardin v. Reynolds*, 189 Ga. 534 (6 SE2d 328) (1939); *Fayette County Bd. of Tax Assessors v. Ga. Utilities Co.*, 186 Ga. App. 723, 725 (368 SE2d 326) (1988). For example, if 100 bottles of aspirin have a fair market value of $100, but the 100 bottles are returned with a value of $50, there is a default as to the 50 percent of the aspirin not represented in the returned value. A subsequent audit and tax bill covering the 50 percent undervaluation cannot be considered a "reassessment" or "revaluation," since 50 percent of the value of the inventory was omitted from the return in the first place. See *Garr v. E. W.*

*Banks Co.*, supra at 831 (3); *Hardin v. Reynolds*, supra at 543.[1] As was noted in *Fayette County Bd. of Tax Assessors v. Ga. Utilities Co.*, supra at 725, items of personalty, such as those represented in the contested returns of appellant, are separate from each other and have independent value; thus, the undervaluation of such personalty is an *omission* of those units not represented by the valuation in the return.

The case law upon which appellant relies relating to real property is completely inapplicable procedurally. In fact, the assessment and taxation of tangible personalty and real property are procedural opposites. The failure to recognize the difference in the procedural postures thereof has permitted confusion in this area, thereby generating assertions such as that of the appellant, who argues based upon realty cases that an audit by the Tax Board, the subsequent discovery of an undervaluation on the personal property returns of past years, and the resulting tax bill therefor is the equivalent of a forbidden "reassessment" and "revaluation" by the Tax Board as occurs with real property reassessments. Such is not the case.

Real estate taxation deals with land and the improvements thereon which are considered "one" and cannot be separated so as to have value apart from each other. *Fayette County Bd. of Tax Assessors v. Ga. Utilities Co.*, supra; *Fulton County Bd. of Tax Assessors v. Dean*, 219 Ga. App. 137 (464 SE2d 257) (1995). Realty and the improvements thereto are out in the open and may be compared with other properties, the value of which are matters of public record. The tax assessor may use independent information available to actually assess the realty. Due diligence in the inspection of realty reveals any improvements or changes in the fair market value in the real estate market. Accordingly, real property is capable of a fair market valuation by the tax assessor, separate and apart from any tax return. For this reason, realty is yearly appraised and valued *first* by the tax assessor, and a tax bill issues thereon from the tax collector to the taxpayer, who eagerly awaits his yearly assessment. Rules & Regulations of the State of Georgia, Chapter 560-11-3-.17. No return by the taxpayer is necessary, and the payment of the subsequent tax bill is the payment of the *tax assessor's* determination of the realty's fair market value. See OCGA §§ 48-5-18; 48-5-20. Thereafter, any attempt to tax a previously unreturned or undiscovered improvement to the realty for years past would be a "revaluation" by the tax assessor of the same property after the taxes, as previously assessed and valued by the tax assessor, had been paid in full to the tax collec-

---

[1] *Garr v. E. W. Banks Co.*, supra, applied such principles of "default" to goods and inventory undervalued in a tax return. *Hardin v. Reynolds*, supra, applied such principles of default to unreturned cash on deposit, notes, and accounts.

tor. *Fayette County Bd. of Tax Assessors v. Ga. Utilities Co.*, supra at 725. Clearly, the equities of this scenario demonstrate that issues of double taxation may arise, since the tax assessor had already passed upon the fair market value of the land. Consequently, this Court has, where land is concerned, precluded a second reassessment when the tax collector's tax bill has been paid in full.

By contrast, however, tangible personal property, such as in the case sub judice, must be valued first by the *taxpayer* in a return. Rules & Regulations of the State of Georgia, Chapter 560-11-3-.18.[2] Obviously, a good faith tax return is required, because, absent an audit, a tax assessor cannot know the nature and extent of a taxpayer's personalty. Such personalty may be moved, hidden, undervalued, or simply not reported. Clearly, an audit cannot be conducted as to every taxpayer, upon every year. Thus, the taxpayer must value his own personal property in his tax return. Thereafter, taxes are assessed by the tax assessor and a tax bill issued by the tax collector based upon the *taxpayer's* good faith valuation in the return. The equities in this scenario are equally clear; if a subsequent audit by the Tax Board uncovers an undervaluation of the personalty contained in the return, in no manner can this audit and assessment be considered a second "revaluation" or "reassessment" as argued by appellant. The Tax Board had not previously passed upon the valuation as contained in the taxpayer's return, as in the case of real property. The difference in the procedural posture in the taxation of personalty and real property must be delineated, and we decline appellant's invitation to blur the distinction.

Appellant's reliance upon Opinion U87-13 of the Attorney General of Georgia, published May 14, 1987, also compels consideration thereof.

In U87-13, an unofficial opinion, the Attorney General reviewed Georgia Ad Valorem Tax Code, OCGA § 48-5-1 et seq., along with case law, and determined that OCGA § 48-5-306 "may be used to revalue and assess any property for any tax year in which that property has not already been assessed *in accordance with OCGA § 48-5-306. . . .* Property that has been returned may only be revalued in accordance with OCGA § 48-5-306 if the Board has *not previously* rendered a final assessment of that property *pursuant to the same Code section* [OCGA § 48-5-306]." (Emphasis supplied.) To the extent that the Attorney General's opinion may be read to preclude *two* audits pursuant to OCGA § 48-5-306 (a) and subsequent reassessments of a personal property tax return for any given year, such

---

[2] Tangible personal property tax form PT-50 includes a request on the reverse side to include a "description" and the "market value" of personal property.

opinion is approved. See also Ga. L. 1943, pp. 244-245 (Ga. Code Ann. § 92-6703) (when Tax Board has already *passed* upon a previous assessment pursuant to audit powers, an additional reassessment is void). To the extent that the Attorney General's opinion may be read to impede a Tax Board's ability to audit, within the statute of limitation, a personal property tax return and to collect additional taxes for any undervaluation of previously returned personal property pursuant to OCGA §§ 48-5-299 (a) and 48-5-306 (a), such opinion is disapproved for the following reasons.[3]

OCGA § 48-5-299 (a) empowers the Tax Board to determine the value of "any property upon which for any reason *all* taxes due the state or county have not been paid *in full* . . . [and to] assess against [the taxpayer] the *full* amount of taxes which has accrued and which may not have been paid at any time within the statute of limitations." (Emphasis supplied.) Clearly, the use of the term "paid in full" means that some taxes have been paid, but not "in full." Further, no restriction regarding "returned" or "unreturned" property is placed upon such empowerment under OCGA § 48-5-299 (a). In the construction of a statute the legislative intent must be determined from a consideration of it as a whole. The construction of language and words used in one part of the statute must be in the light of the legislative intent as found in the statute as a whole; a statute must be read without "reading out" any other part, unless there is a clear reason for doing so. See *Gwinn v. State Ethics Comm.*, 262 Ga. 855, 859-860 (426 SE2d 890) (1993); *Bozeman v. Tifton Fed. Sav. &c. Assn.*, 164 Ga. App. 260, 262-263 (297 SE2d 49) (1982). To that end, OCGA § 48-5-299 *(b)* specifically refers to "unreturned" property and attaches a penalty for the failure to return property altogether; the specificity with which subsection (b) is directed at "unreturned" property reinforces the fact that subsection (a) is to draw no such distinction, and that the Tax Board's power to ensure that all taxes are paid in full extends to property that has been returned but undervalued, as well as to property that has not been returned at all.[4]

Moreover, under the statute, the Tax Board's determination that taxes have not been "paid in full" may come at any time within the statute of limitation, which begins at the time of filing. Clearly then, this time frame must encompass those situations wherein the discov-

---

[3] See *Williams v. State*, 162 Ga. App. 415, 418 (1) (291 SE2d 732) (1982) (opinions of the Attorney General are not binding upon this Court, even where applicable to the issues before us).

[4] Even prior to Ga. L. 1978, pp. 309, 450, § 2 (Ga. Code Ann. § 91A-1440, now OCGA § 48-5-299), Ga. L. 1918, pp. 232, 233-234 (Ga. Code Ann. § 92-6701 et seq.) provided for the assessment of "unreturned" or "under-returned" personal property. See also *Garr v. E. W. Banks Co.*, supra at 832; *Hardin v. Reynolds*, supra at 542-543; see also Ga. L. 1943, pp. 243, 244.

ery of an undervaluation occurs pursuant to an audit conducted years after the personal property tax return has been filed and the taxes have been paid. See, e.g., *Richards v. Zentner*, 176 Ga. 222, 226 (1) (167 SE 516) (1933) (notice is applicable for the "raising of the valuation of property for the year in which the returns are made; and for stronger reasons it would seem to be applicable to the raising of returns of property made by a taxpayer for preceding years").

Accordingly, by the plain meaning of its own terms, OCGA § 48-5-299 (a) empowers the Tax Board to audit, at any time within the statute of limitation, prior personalty tax returns and collect taxes over and above those that may have been assessed and paid, because the valuation of the personalty by the taxpayer was incorrect, and thus the taxes were not "paid in full."

The mechanism providing the procedural details for such assessment and collection is OCGA § 48-5-306 (a), which Code section must, of course, be read in pari materia with OCGA § 48-5-299 (a). OCGA § 48-5-306 (a) is that portion of the Ad Valorem Tax Code that provides for an audit to be conducted upon personal property tax returns and notice to be given for any resultant changes in such returns if "any taxpayer has *omitted* from his returns any property that should be returned *or* has failed to return any of his property *at its fair market value*." (Emphasis supplied.) This audit may take place "at any time" within the statute of limitation. OCGA §§ 48-5-299 (a); 48-5-306 (a). Clearly, by its plain terms, OCGA § 48-5-306 (a) permits the Tax Board to audit and make changes to a taxpayer's return with regard to personalty omitted *and* with regard to personalty that has been returned but undervalued.

A perhaps painful, but necessary historical analysis of our Ad Valorem Tax Code will underscore the point that OCGA §§ 48-5-299 (a) and 48-5-306 (a) were intended to encompass the collection of additional taxes on returns wherein taxes may have been paid in previous years, but the personal property was undervalued by the taxpayer in the return.

An Equalized System of Taxation was created by Ga. L. 1913, p. 123. Our current Code sections OCGA §§ 48-5-299 (a) and 48-5-306 (a) were, at that time, melded together in Section 6 of Ga. L. 1913, pp. 123, 127, which section specifically provided, inter alia, that "if [the] tax payer has omitted from his returns any property that should be returned or has failed to return any of his property at a just and fair valuation, the said board shall correct such returns." Thus, OCGA §§ 48-5-299 and 48-5-306 began their codified life together, inseparable in intent and design.

In Ga. L. 1918, p. 232, the General Assembly added an Act to provide for the *collection* of taxes, which Act specifically provided for the collection of taxes "when the owner of property has omitted to

return the same for taxation at the time or for the years the return should have been made, or *having returned his property or part of the same, has grossly undervalued the property returned,* or his property has been assessed for taxation at a figure grossly below its true value." (Emphasis supplied.) Such taxes were considered "delinquent," and the legislature contemplated that such collection would encompass additional taxes due from undervaluation in prior years.[5]

In 1933, a new Tax Code was passed; it was amended in 1937. In the caption to the 1937 Act, the General Assembly specified that the Tax Code was to prescribe the examination of tax returns with respect to the assessment for taxation of "all property, including both property which has been returned and unreturned property." Ga. L. 1937, p. 517. The 1933 Code and the 1937 amendment first split apart those principles contained in our current OCGA §§ 48-5-299 (a) and 48-5-306 (a), in an attempt to emphasize the duties and powers of the Tax Board (OCGA § 48-5-299 (a)) and the procedures, including notification, to be used when employing those duties and powers (OCGA § 48-5-306 (a)). See Ga. L. 1937, pp. 519, 520; Ga. Code Ann. §§ 92-6912; 92-6913. In the new Code, the Tax Board was specifically given the power and duty to collect taxes on personal property the "taxpayer has omitted from his returns . . . or has failed to return [at] a just and fair valuation." Ga. L. 1937, p. 519. By 1937, it is safe to assume that business and population increases in this State must have rendered nearly impossible a Board assessment of every personal property return within the same year in which it was filed. Thus, in this Code is introduced for the first time the provision that assessment of a tax return may come at "any time within the statute of limitations," and additional taxes may be assessed *for any reason* all taxes due to the State or to the county have not been *paid in full."* (Emphasis supplied.) Ga. L. 1937, p. 520. The duties of the Tax Board, presumably stretched to the limit by the time constraints of placing all tax returns upon the books within the statutory tax year,[6] provided that actual assessments of individual personal property returns, as opposed to the acceptance of the taxpayer's valuations therein, be allowed to occur outside the tax year. See *Garr v. E. W. Banks Co.,* supra at 832 (time provisions of the Code do not deprive the Tax Board of the authority to perform their duties after the statutory time provision, but within the statute of limitation).

---

[5] In *Hardin v. Reynolds*, supra, the Supreme Court of Georgia specifically noted that while our tax code of 1918 did not repeal the Tax Equalization Act of 1913 (Ga. Code Ann. §§ 92-6901–92-6907), the Act of 1918 amended the 1913 Code to the extent of providing that assessments made are not final, but "shall be open for further consideration by the taxing authorities in case of omitted property *or* of a gross undervaluation or assessment." (Emphasis supplied.) Id. at 543 (2).

[6] See, e.g., OCGA §§ 48-5-301; 48-5-302.

Thereafter, in Ga. L. 1943, pp. 243, 244 (Ga. Code Ann. § 92-6703), the legislature sought to limit the Tax Board's *audit* powers by therein specifically providing "if the County Board of Tax Assessors has *previously passed* upon the assessment of this same property for the years involved, then a *reassessment* of this property heretofore or hereafter made by the Tax Receiver under this chapter, shall be void." (Emphasis supplied.) Cf. Ga. L. 1918, pp. 232-234.

By 1978, our Tax Code was, again, amended "exhaustively and completely." Ga. L. 1978, p. 309. Title 91A was created wherein the General Assembly clarified that its intent was not "to make any substantive change in the revenue laws of this State, except as *expressly* provided for in this Act." (Emphasis supplied.) Id. at 310-311. Thus, Ga. L. 1978, pp. 309, 764-794, § 3 (1), repealed the provisions of Title 92 only to the extent that it was specified in the new Code. However, there was no specific repealer as to those portions of Title 92 which encompassed both Ga. L. 1918, pp. 232-234, regarding the taxing authority's ability to assess and collect taxes upon returns in which property was omitted or undervalued, and the above Code section under Ga. L. 1943, pp. 243-244, limiting audit powers to one reassessment and revaluation for any given tax return.[7] The 1978 Code mirrors our current legislation, with Ga. Code Ann. § 91A-1440 embodying the principles of OCGA § 48-5-299 (a) and also providing specific penalties for "unreturned" property, as does OCGA § 48-5-299 (b). Ga. L. 1978, p. 450. Section 91A-1448 encompasses OCGA § 48-5-306 (a) and, again, permits the collection of taxes "at any time" for those returns in which personal property has been omitted *or* in which a taxpayer has "failed to return any of his property at its fair market value." Ga. L. 1978, p. 454.

Such is the state of the law under our current Tax Code, and this historical perspective demonstrates that the legislature has contemplated that returned but undervalued personal property should be taxable when uncovered by an audit, i.e., when a personalty return is ultimately "passed" upon by the Tax Board within the statute of limitation. Even if the taxes on such personalty had been paid in years past, the taxes were not "paid in full," because of the undervaluation *by the taxpayer*. The Attorney General's Opinion U87-13 is disapproved to the extent it may be read to conflict herein.[8]

---

[7] There was a specific repealer as to 157 other statutes under the prior Code.

[8] Further review of Op. Atty. Gen. U87-13 shows that the Attorney General's apparent goal was a conclusion consistent with a former Opinion of the Attorney General, U69-183, dealing with the reassessment of real estate. To this end, the plain language of OCGA §§ 48-5-299 (a) and 48-5-306 (a) was ignored, and case law which specifically supported the collection of taxes for previously undervalued personal property was "distinguished." See *Colvard v. Ridley*, 218 Ga. 490 (128 SE2d 732) (1962); cf. *Colvard v. Ridley*, 219 Ga. 361 (133 SE2d 364) (1963); see also *Garr v. E. W. Banks Co.*, supra; *Richards v. Zentner*, supra; *Hardin v.*

In sum, when, within the statute of limitation, an audit uncovers that a taxpayer has undervalued his personalty in a previous year's personal property tax return, the undervalued personalty may be assessed and taxed by the Tax Board. The defaulting taxpayer is in no way permitted to benefit from the undervaluation on the basis urged by appellant before this Court, which argument is, in essence, that collection is prohibited because the undervaluation was not caught before the tax bill was paid. "That [taxes in the full amount] were due five, four, three, and two years ago, and have gone unpaid, is no relaxation of the obligation to pay them. Can it be contended that, because one in [1992 or 1993 undervalued] his taxable property, he is thereby released from his obligation to pay [full] tax thereon[?] . . . These taxes are just as much due now as they were in the year they were incurred." *Ga. R. &c. Co. v. Wright,* 124 Ga. 596, 616 (53 SE 251) (1906).

2. "All property shall be returned by the taxpayers for taxation to the tax commissioner or tax receiver as provided by law." OCGA § 48-5-10. Our Tax Code, under OCGA § 48-5-105.1 (b), provides that all returns of tangible personal property shall be made pursuant to the form or forms adopted by the state tax commissioner. In addition, "[e]ach corporation should carefully prepare its return so as to fully and clearly set forth the data called for therein." Rules & Regulations of the State of Georgia, Chapter 560-7-8-.04, p. 263.

The forms for the three-year period at issue herein required that appellant provide a "description" and the "market value" of the personal property of the business and that "expensed as well as depreciable assets should be listed and valued." Appellant did not include such listings and descriptions in its returns, but instead, stamped "See Attached" on the forms and submitted a one-page attachment entitled "Personal Property Tax Filings," which contained the broad categories of: (1) "Inventory Value," and (2) "Furniture & Fixtures, Machinery & Equipment." A numeric value was assigned to each broad category, which number represented appellant's estimate of the fair market value thereof.[9] No tax assessor could determine the true fair market value of such personalty, because the personalty was not disclosed, and only an assigned value was returned.

---

*Reynolds,* supra. However, no such consistency in approach was necessary since, as has been discussed supra, the taxation of real property and tangible personal property are not treated the same procedurally.

[9] Appellant asserts that a representative of the Tax Board "admitted that the return only asks for a value and not a 'listing' and that no taxpayer in Coweta County had ever provided a specific 'listing.'" Such assertion is inaccurate. The "admission" to which appellant refers was in response to a specific question regarding a *single line* on the Freeport Exemption form, which line asks for the "Total Value of Eligible Inventory." Appellant's argument disregards the various other forms which ask for such a listing.

Appellant's procedure of valuing its property, without listing or describing such, circumvents a taxpayer's burden to disclose ownership of property; however, such procedure provides a numeric basis upon which a Tax Board may calculate a taxpayer's ad valorem tax based upon the *taxpayer's* estimate or determination of value, thereby enabling a tax bill to generate and some taxes to be paid thereon in a timely fashion. See OCGA §§ 48-5-301; 48-5-302. Notwithstanding, by utilizing such valuation procedure, appellant has failed to make a "full return," which includes the listing and describing of personal property as requested by the forms, including quantities of each category of personalty.[10] "Imperfect or incorrect returns will not be accepted as meeting the requirements of the law." Rules & Regulations of the State of Georgia, Chapter 560-7-8-.04, p. 263. Moreover, "Important Information" contained in appellant's tax forms warned appellant that, "Failure to file a completed copy of this form may lead to an audit of your records and/or the placing of an assessment on your property from the best information obtainable in accordance with Georgia Code 48-5-299 (A) [sic]." Thereafter, when such audit, properly conducted within the statute of limitation, uncovered appellant's undervaluation of its personal tangible property, appellant is estopped from claiming that a "reassessment" or "revaluation" of *returned* personal property had occurred. No specific items of property were returned so as to allow a re-assessment of the property; only the valuation was returned. As in the case sub judice, when a valuation is discovered as incorrect pursuant to an audit, such valuation, perforce, attaches to no specific personalty so as to provide a basis for a claim of a *re*-valuation or *re*-assessment thereof. Thus, appellant's assertion that, "The new assessments issued by the Board do not enumerate any property *excluded* from the original returns" is so much make-weight, since no specific property was *included* in the original returns. (Emphasis supplied.) "The Georgia law affords to every citizen, individual or corporate, ample facilities for the preservation of his rights as against the tax-gatherer, always provided that he makes a return to the proper officer of the property that he owns. It presupposes that the taxpayer will disclose to the officer all of his taxable property. . . . The requirement of candor in

---

[10] Appellant contends that there is "no dispute that Eckerd included all of its personal property on the returns." On the contrary, such is the heart of the dispute and presents a genuine issue of material fact that will carry this case to trial, wherein the finder of fact will encounter no difficulty in ascertaining what personal property was listed in appellant's returns, since no personal property was listed therein. Whether the numbers add up with regard to the valuations in appellant's returns, the valuations as uncovered by the audit, and the fair market value of the property as determined by the trier of fact will ultimately determine whether all of appellant's personal property was actually "included" in appellant's returns or omitted therefrom.

disclosing the ownership of property is really at the foundation of our tax system. So long as the citizen complies with that requirement, he is afforded every opportunity to dispute with the State the question of the value of his property and the amount of tax to be levied thereon. . . . In other words, ample 'machinery' is available to the citizen who makes full returns; deprivation of the right to be further heard is one of the penalties visited on the defaulter." *Ga. R. &c. Co. v. Wright*, supra at 617 (11).

3. Finally, appellant misinterprets the concepts of "cost" and "fair market value," in arguing that summary judgment should have been granted because the Tax Board improperly assessed appellant's property at cost, as opposed to the statutorily prescribed standard of fair market value.[11] Appellant contends that one is exclusive of the other: "[T]here is no statutory authority to assess inventory at its 'cost.' Rather, the inventory must be assessed at 'fair market value.' " While we agree that property must be assessed at fair market value, OCGA § 48-5-6, "cost" is not a concept foreign to such valuation. What the taxpayer was willing to pay for the personalty, its cost to him, is one of the factors from which fair market value may be determined, if not the primary factor, because such figure is fixed, while other factors may deviate upward or downward from such figure based upon the fair market.

Mistaken also are appellant's attempts to divide and isolate notions of "retail versus wholesale levels of trade" from cost and fair market value. All are integrally related and relevant to the extent that they aid in determining "the amount a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." OCGA § 48-5-2 (3). Clearly, when the market permits appellant to place a higher retail price on a bottle of aspirin, the aspirin wholesaler will not allow appellant to enjoy such profit alone; appellant's wholesale "cost" of aspirin is going to see a similar increase, which will cause an increase in the fair market value of the taxpayer's inventory. The inverse is equally true, if lackluster market demand forces retail and, thus, wholesale aspirin prices down. For ad valorem tax purposes, fair market value is not the retail value to the taxpayer, but the current wholesale value adjusted for the fair market; thus, the taxpayer's cost may be adjusted upward, downward, or remain the same

---

[11] A review of the record shows that the Tax Board utilizes, not "cost" alone, but the "wholesale value [cost] of [personalty] as compared with retail value to the customer" in order to determine fair market value. The Tax Board was hampered in its determination of fair market value in the instant case by appellant's initial refusal to supply supporting documentation of the appellant's "deductions from [the] cost figures and an explanation for some of those deductions in a narrative form."

to reflect the "wholesale market" as it determines the fair market value of the tangible personalty in the taxpayer's possession at that economic moment in time.

Contrary to appellant's contentions, the fair market valuation of personal property for tax purposes does not occur in a vacuum but may be determined by utilizing several indices, including "cost" to appellant, as well as wholesale pricing in relation to retail levels of trade. See *Rogers v. DeKalb County Bd. of Tax Assessors*, 247 Ga. 726, 727 (2) (279 SE2d 223) (1981). In a stagnant economy, "cost" may, in fact and law at any particular economic moment in time, constitute "fair market value." Thus, appellant's argument that " 'cost' and 'fair market value' are not the same and that what the law requires for assessment is fair market value," is simply inaccurate, and we conclude that, "cost" may be part and parcel of an assessment of the "fair market value" of personalty.

*Judgment affirmed. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED AUGUST 11, 1997 — 

*Alston & Bird, G. Conley Ingram, Timothy J. Peaden*, for appellant.

*Glover & Davis, Jerry A. Conner, Asa M. Powell, Jr.*, for appellee.