A00A1658, A00A1659. DELTA AIR LINES, INC. v. CLAYTON COUNTY BOARD OF TAX ASSESSORS; and vice versa.

(539 SE2d 905)

MIKELL, Judge.

This appeal arises from an ad valorem property tax dispute between Delta Air Lines, Inc. ("Delta") and the Clayton County Board of Tax Assessors ("Board"). After Delta filed its 1997 Business Personal Property Report, the Board returned an assessment notice (1) denying Delta's claim for an exemption (commonly referred to as the "freeport" exemption) from ad valorem taxation for certain inventory, and (2) disallowing Delta's valuation of certain airplane parts. Delta unsuccessfully appealed the assessment to the Clayton County Board of Equalization and then appealed to the superior court. In superior court, the Board moved for summary judgment on all issues,

while Delta moved for partial summary judgment on the question of whether it was entitled to the freeport exemption. In Case No. A00A1658, Delta appeals the grant of summary judgment to the Board on the freeport issue. In Case No. A00A1659, the Board appeals the trial court's denial of its motion for summary judgment on the valuation dispute. For the reasons set forth below, we find that the freeport exemption is available for certain of Delta's aircraft engines and parts and therefore reverse the trial court's grant of summary judgment to the Board on the question of whether Delta was entitled to claim the exemption. We also find that Delta presented triable issues of fact regarding the valuation of its personal property, and we affirm that portion of the trial court's order denying the Board's motion for summary judgment.

## Case No. A00A1658

We review a trial court's grant of summary judgment de novo, and we view the evidence in the light most favorable to the nonmovant.[1] On de novo review, we "owe no deference to the trial court's conclusions of law. Instead, we are free to apply anew the legal principles to the facts."[2] Disposition of this appeal necessitates our interpretation of the statutes authorizing the freeport exemption.

It is a cardinal rule . . . that . . . exemptions [from taxation] should be strictly construed in favor of the public, and that nothing passes by implication. On the other hand, if the language of a statute is plain and susceptible of but one natural and reasonable construction, the court has no authority to place a different construction upon it, but must construe it according to its terms.[3]

The Georgia Constitution authorizes the governing authority of any county or municipality, subject to voter approval, to exempt from ad valorem taxation "inventories of goods in the process of manufacture or production, and inventories of finished goods."[4] The state legislature implemented this "freeport" exemption through enactment of OCGA §§ 48-5-48.1 and 48-5-48.2. A voter referendum approving the freeport exemption in Clayton County was held on September 27, 1979. The county board of commissioners implemented the exemp-

---

[1] *Taylor v. Gelfand*, 233 Ga. App. 835-836 (505 SE2d 222) (1998).

[2] *Espinoza v. State*, 265 Ga. 171, 172 (1) (454 SE2d 765) (1995).

[3] (Citations and punctuation omitted.) *Fulton County Tax Commr. v. Gen. Motors Corp.*, 234 Ga. App. 459, 466-467 (1) (507 SE2d 772) (1998).

[4] Ga. Const. 1983, Art. VII, Sec. II, Par. III.

tion for each of the three categories authorized by statute.[5] These categories can be generally described as including: (1) inventory of goods in the process of manufacture or production[6] ("Category 1"), (2) inventory of finished goods in the hands of the original manufacturer[7] ("Category 2"), and (3) inventory of finished goods held for shipment outside the state[8] ("Category 3").

Delta claimed a freeport exemption in its 1997 business personal property tax return for: (1) aircraft engines and engine parts in the process of remanufacture at its Technical Operations Center ("TOC") in Clayton County; (2) parts manufactured at the TOC from raw materials; and (3) parts destined for shipment to a location outside this state. The Board denied the claims.

## Technical Operations Center

Delta overhauls airplane engines at the TOC. Work is performed only on engines that have been separated from their aircraft. Delta categorizes the work done on the engines as either "light" or "heavy" maintenance. An engine is subject to heavy maintenance if it contains components that have reached their operational time limit. An engine can also receive heavy maintenance if it is removed for damage or nonperformance, although engines removed for these reasons are most often classified as receiving "light" maintenance. Heavy maintenance involves the complete disassembly of the engine, the piece-by-piece inspection of every component, and the restoration of each component to its original form and specifications. Engines that fall within the light maintenance category are those that do not require a complete overhaul, although the work involved may include a complete restoration of an engine module. Light maintenance may require as little as two to three days or as many as twenty-five to thirty-five days to complete. Heavy maintenance may require from 45 to 70 days to complete, depending on the type of engine. Costs per engine average $400,000 for light maintenance and $600,000 for heavy maintenance. Delta estimates it would incur approximately twice the cost for outsourcing its engine overhauls.

Delta also manufactures aircraft parts from raw materials at the TOC. The types of parts made range from routine to specialized pieces based on blueprint drawings. Delta stores airplane parts in a warehouse and ships them to its airport stations in other states as needed.

---

[5] Clayton County Code, §§ 90-36 through 90-38.
[6] OCGA § 48-5-48.2 (b) (1).
[7] OCGA § 48-5-48.2 (b) (2).
[8] OCGA § 48-5-48.2 (b) (3).

## Category 1 Freeport Exemption

1. Delta argues that aircraft engines and parts which are being overhauled at the TOC qualify for the Category 1 freeport exemption under OCGA § 48-5-48.2 (b) (1).

The exemption applies to: "(1) Inventory of goods in the process of manufacture or production which shall include all partly finished goods and raw materials held for direct use or consumption in the ordinary course of the taxpayer's manufacturing or production business in this state. . . ." In order to qualify for the exemption, the goods must be "substantially modified, altered, or changed."

The statute was amended effective January 1, 1997, to add the following two sentences: "[R]emanufacture of aircraft engines or aircraft engine parts or components shall constitute manufacturing operations in this state. Remanufacture . . . means the substantial overhauling or rebuilding of aircraft engines or aircraft engine parts or components."

"Substantial overhauling," in turn, "means the disassembling, repairing, renovating, reassembling, reconstructing, inspecting, or testing, thereby restoring the aircraft engine or aircraft engine parts or components to their original state or an upgraded state."[9]

(a) *Engines in the process of remanufacture qualify for the Category 1 exemption.* The record contains uncontroverted evidence that engines in the process of "heavy" maintenance satisfy the statutory requirements for a Category 1 exemption. Under the revised statute, remanufacturing of aircraft engines is defined as the substantial overhauling or rebuilding of aircraft engines. The legislature obviously intended that aircraft engines in the process of remanufacture would qualify for the freeport exemption. Even disregarding the language specifically addressing aircraft engine remanufacture, we find that the process of heavy maintenance described by uncontradicted testimony, constituting the disassembly of the engine, the replacement of a number of expendable parts, the machine working of other parts to specification, its reassembly and testing over an approximate six- to eight-week period, is "substantial."

Whether engines in the process of "light" maintenance undergo substantial overhauling or rebuilding is less clear. Delta's director of engine maintenance testified that some light maintenance work required only a few days to complete, while other "light" maintenance work required several weeks, and consisted of the breakdown and refurbishing of one or more, but not all, engine modules. Delta claimed the Category 1 freeport exemption for all engines undergoing

---

[9] Dept. of Revenue Rule 560-12-2-.105 (1) (c).

heavy maintenance as well as all large engines undergoing light maintenance. Delta did not claim the exemption for small engines undergoing light maintenance. The apparent reason for the division was that work on the larger engines was more costly. While we agree that cost is a factor in determining whether substantial work was performed on an engine, the actual nature of the work performed on the engine would provide the most probative evidence of "substantial overhauling or rebuilding." Light maintenance, unlike heavy maintenance, does not by its nature constitute a substantial modification, alteration, or change to an engine. The record indicates that light maintenance varies from what could best be characterized ·as a repair lasting several days to substantial and time-consuming rebuilding over a period of several weeks. Whether the engines at the TOC undergoing "light" maintenance were undergoing "substantial overhauling or rebuilding" is unclear from the record. Accordingly, we hold that this issue merits submission to a jury.

The Board has raised a number of issues which they claim preclude the availability of the Category 1 freeport exemption to Delta. Although we discuss each of the Board's contentions in some detail below, we find none have merit.

(b) *Engines in the process of remanufacture constitute "inventory."* The Board correctly points out that the "freeport" exemption, also known as the "tangible personal property inventory exemption,"[10] applies only to inventory. The Board argues that because the engines at issue are destined for internal reuse and not for sale, they do not constitute "inventory" for purposes of the freeport exemption.[11] To support this position, the Board refers us to accounting standards which define "inventory" as personal property (1) held for sale in the ordinary course of business, (2) in the process of production for such sale, or (3) to be consumed in the production of goods or services to be available for sale.[12] Delta urges this Court to apply a more general definition of inventory, which includes "work in progress or materials used or consumed in a business," as well as "goods held for sale."[13]

In construing a legislative act, a court must first look to the literal meaning of the act. If the language is plain and does not lead to any absurd or impractical consequences, the court simply construes it according to its terms and conducts no further inquiry. . . .[14]

---

[10] OCGA § 48-5-48.1.
[11] The Board repeats this argument with respect to the Category 2 and 3 exemptions. We need address only the definition of "inventory" here.
[12] American Institute of Accountants, Accounting Research Bulletin No. 43, p. 27.
[13] See Black's Law Dictionary (6th ed. 1990), p. 824.
[14] (Citations and punctuation omitted.) *Apollo Travel Svcs. v. Gwinnett County Bd. of*

We are persuaded that "inventory," for purposes of OCGA § 48-5-48.2, should not be read as narrowly as the Board insists. A "plain language" definition includes simply "a quantity of goods or materials on hand."[15] The more precise statutory definition of "inventory," which is contained in the commercial code, provides:

> Goods are . . . (4) "Inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, *or if they are raw materials, work in progress, or materials used or consumed in a business.* Inventory of a person is not to be classified as his equipment.[16]

The engines claimed by Delta under the Category 1 exemption qualify as works in progress. The finished goods claimed by Delta under the Category 2 and Category 3 exemptions are parts consumed in its business operations. Therefore, the property listed by Delta on its 1997 Business Personal Property Report is "inventory" for purposes of the freeport exemption.

(c) *The aircraft engines were substantially modified in the remanufacturing process.* The Category 1 exemption applies only to "tangible personal property which is substantially modified, altered, or changed in the ordinary course of the taxpayer's manufacturing, processing, or production operations in this state."[17] The Board claims that Delta's overhauled engines are not substantially modified, altered, or changed at the TOC because they enter the TOC as aircraft engines and emerge from the TOC as aircraft engines. We find no merit in this argument. As discussed in Division 1 (a), supra, the record indicates that the process of substantial overhauling involves the alteration or replacement of all or a significant portion of the internal components of an engine. The process physically changes the engine, as well as changing the function of the engine so it is again qualified to serve on an aircraft. Contrary to the Board's argument, this process differs dramatically from that used to package cookies, thus distinguishing this case from *Murray Bakery Products v. Bd. of Tax Assessors.*[18] In *Murray Bakery Products*, the Supreme Court held that the mere assembling of packaging materials purchased by a cookie manufacturer did not substantially change those materials, so that they did not qualify for the freeport exemption.[19]

---

*Tax Assessors*, 230 Ga. App. 790, 791-792 (3) (498 SE2d 297) (1998).
[15] Webster's Collegiate Dictionary (10th ed.), p. 616.
[16] (Emphasis supplied.) OCGA § 11-9-109.
[17] OCGA § 48-5-48.2 (b) (1).
[18] 258 Ga. 484 (371 SE2d 393) (1988).
[19] Id. at 485 (2).

(d) *Delta's business involves both transportation and manufacture.* The statute restricts the Category 1 exemption to goods in the taxpayer's "manufacturing, processing, or production operations in this state."[20] The Board argues that the freeport exemption applies only to property produced by a manufacturing business, and that Delta is a transportation company. The fact that Delta is in the transportation business is not fatal to Delta's claim for a Category 1 exemption. The record indicates that Delta functions as a manufacturer of aircraft parts and a remanufacturer of aircraft engines in the regular course of its business, and that those operations are located in this state.

(e) *Voters were not required to expressly approve the inclusion of aircraft engine remanufacturing within the Category 1 exemption.* The Board claims that because the voters of Clayton County did not approve the freeport exemption after the amendment addressing the remanufacture of airplane engines[21] became effective, the Category 1 exemption does not apply to such remanufacture. The Board's position contemplates that county voters must hold a referendum to approve every amendment affecting the freeport tax exemption. Clearly, that is not required. The voters approve the freeport tax exemption, but the Georgia Constitution delegates the details of implementing the exemption to the legislature.[22]

(f) *Engines lying idle in the TOC may nevertheless be in the process of remanufacture.* It is apparent from the record that the engines were in various stages of work, and that physical work had not begun on each of them. The Board would deny the Category 1 exemption to those engines lying idle in the TOC. However, as long as an engine enters the process of remanufacture, whether it be in the diagnostic stage or awaiting an open bin for work to begin, the extent of an engine's progress toward completion of the process need not be considered. The engines are "works in progress" under the statute, and so the statutory consideration is whether they are "in progress" and not at what stage of progress.

(g) *The Board's claim that the freeport tax exemption is unconstitutional is not supported by argument.* Finally, the Board claims that the freeport exemption is unconstitutional. This claim is not supported by argument, and we will not consider it.[23]

Accordingly, we hold that the trial court erred in granting summary judgment to the Board on Delta's claim for the Category 1 free-

---

[20] OCGA § 48-5-48.2 (b) (1).

[21] Ga. L. 1996, p. 926, § 1.

[22] Ga. Const. 1983, Art. VII, Sec. II, Par. III.

[23] Court of Appeals Rule 27 (b) (2) (Appellee's brief shall contain appellee's "argument and the citation of authorities as to each enumeration of error").

port exemption. We also find the trial court erred by failing to grant summary judgment to Delta on the issue of whether engines undergoing "heavy" maintenance qualified for a Category 1 exemption. Finally, we hold that a jury issue remains with respect to those engines undergoing "light" maintenance.

*Category 2 Freeport Exemption*

2. Delta next contends that other aircraft parts manufactured from raw materials at the TOC qualify for the freeport exemption under OCGA § 48-5-48.2 (b) (2), which exempts "[i]nventory of finished goods manufactured or produced within this state in the ordinary course of the taxpayer's manufacturing or production business. . . ." Finding that genuine issues of material fact remain, we reverse the grant of summary judgment to the Board on this issue.

(a) *Delta satisfied the freeport application requirements for Category 2.* The Board claims that Delta's application for the Category 2 exemption was incomplete because it did not contain a list of the specific parts for which the exemption was claimed. The Board points out that OCGA § 48-5-48.1 (b) (2) requires the taxpayer to furnish a schedule of the inventory of finished goods along with the application and provides that failure to file the application and schedule properly constitutes a waiver of the exemption.

Delta completed an official freeport application form according to the form's specifications. The form only required that Delta "list total value of [Category 2] eligible inventory," which Delta provided on an attached schedule.[24] When the Board asked for additional information as part of discovery, the record indicates Delta offered microfiche records. "All returns of tangible personal property shall be made pursuant to the form . . . adopted by the commissioner."[25] It strains traditional concepts of fair play and justice to permit a taxing authority to "punish" the taxpayer who supplies information in the format required by the taxing authority. We decline to do so here. We find that Delta properly completed the 1997 application for a Category 2 freeport exemption.

(b) *Whether the Category 2 property was less than 12 months old is a question of fact.* The Category 2 exemption applies only to parts held less than a year after they are manufactured.[26] Delta presented evidence that the Category 2 property was less than 12 months old. The record indicates that Delta considered the time requirement in

---

[24] Delta completed the 1996 freeport application without a separate schedule listing the Category 2 property, without objection from the Board.

[25] OCGA § 48-5-105.1 (b).

[26] OCGA § 48-5-48.2 (b) (2).

completing the application, and that its inventory of manufactured parts turns over from two to six times per year, depending on the part. This is evidence that the 12-month time limit was satisfied. However, the Board presented evidence that Delta held the property for more than 12 months. The record indicates that Delta depreciates the parts, which implies that some are held for longer than one year.

Accordingly, we hold that the trial court erred in ruling as a matter of law that Delta could not claim the Category 2 exemption for aircraft parts manufactured from raw materials. The conflicting evidence warrants a jury trial on this issue.

### Category 3 Freeport Exemption

3. Delta contends that aircraft parts stored at the TOC on January 1, 1997, and destined for shipment to airport stations outside Georgia, qualify for the freeport exemption under OCGA § 48-5-48.2 (b) (3), which exempts:

> Inventory of finished goods which, on January 1, are stored in a warehouse, dock, or wharf, whether public or private, and which are destined for shipment to a final destination outside this state. . . . The exemption provided for in this paragraph shall be for a period not exceeding 12 months from the date such property is stored in this state. Such period shall be determined based on application of a first-in, first-out method of accounting for the inventory. The official books and records of the warehouse, dock, or wharf where such property is being stored shall contain a full, true, and accurate inventory of all such property, including the date of the receipt of the property, the date of the withdrawal of the property, the point of origin of the property, and the point of final destination of the same, if known. . . .

Under OCGA § 48-5-48.2 (a) (1),

> "Destined for shipment to a final destination outside this state" includes that portion or percentage of an inventory of finished goods which the taxpayer can establish, through a historical sales or shipment analysis, either of which utilizes information from the preceding calendar year, or other reasonable, documented method, is reasonably anticipated to be shipped to a final destination outside this state.

(a) *Delta has presented evidence that the goods qualify for the Category 3 exemption.* The record reflects that Delta stores aircraft parts at the TOC that are destined for shipment outside Georgia.

Some of the parts are shipped to Delta airport stations for use by Delta, while others are sold as surplus on the secondary market.

(b) *Parts need not be held for resale to qualify as finished goods.* The Board argues that the goods do not qualify as "finished goods" because they are not held for resale. However, the statute imposes no such requirement, and, contrary to the Board's assertion, *Apollo Travel Svcs. v. Gwinnett County Bd. of Tax Assessors*[27] does not imply one. In *Apollo Travel Svcs.* we held that, under the facts of that case, computers which are leased and are being held in inventory for eventual shipment out of the state are not eligible for a freeport exemption because OCGA § 48-5-48.2 (a) (2) excludes from the definition of "finished goods" items which are the "stock in trade of a retailer."[28] A further refinement in the statute's fine print specifies that goods stored in or near a retail business in this state shall not be considered the "stock in trade of a retailer" when it can be established that they are to be shipped outside the state for resale.[29] The taxpayer in *Apollo* was a retailer, and it could not fit its inventory of finished goods within the resale exemption to the "stock in trade of a retailer" exclusion from the definition of "finished goods." In the case at bar, Delta is not a retailer. For it to obtain the freeport exemption it does not have to prove that the airplane parts are intended for resale, and the *Apollo* precedent is not apposite.

(c) *Delta provided evidence that it satisfied the 12-month test.* The Board claims that Delta has failed to produce any evidence showing that the goods claimed for the Category 3 exemption have been held in this state for less than 12 months. They maintain that any evidence that Delta has presented with regard to the "turnover" rate of inventory is inapplicable because the statutory determination of inventory age is determined on a "first-in, first-out method of accounting." Delta has presented evidence indicating that no inventory is on hand longer than 12 months. This is adequate to satisfy the statute regardless of accounting methodology. The Board, however, points to evidence that some parts remain in stock for over 12 months. Absent a legal reason for directing a verdict for the Board, a jury must determine the extent Delta is entitled to claim the Category 3 exemption.

(d) *Goods are shipped to a final destination even if they are returned to Delta at the end of their useful lives.* The Board claims that Delta does not ship parts to a "final" destination because the parts are destined to return to the TOC. Nevertheless, the parts are apparently shipped with the intention that they will be used for the

---

[27] Supra, 230 Ga. App. 790.
[28] Id. at 792.
[29] OCGA § 48-5-48.2 (a) (4).

full period of their useful lives, and not for a prearranged time, as with a leased product.[30] The mere possibility that a part will be returned to the TOC for remanufacture, as opposed to being discarded, destroyed, or sold, is too remote to find that a part shipped for use at an out-of-state airport operations center is not shipped to its final destination.

As the evidence is in conflict, resolution of this issue belongs to the jury, and the trial court erred in granting summary judgment to the Board.

### Case No. A00A1659

The Board cross-appeals from the denial of its motion for summary judgment. The Board valued the personal property returned by Delta at original cost, while Delta valued the property at net book value.

4. *Valuation is a jury issue.* For ad valorem tax purposes "[a]ll property shall be returned for taxation at its fair market value. . . ." OCGA § 48-5-6. Determination of the fair market value of the property involved is generally a question for the trier of fact.[31]

5. *Delta provided the information required by the business personal property return.* The Board maintains that Delta cannot dispute the Board's valuation because Delta failed to include the description and quantity of all of its personal property on its return. Examination of "Section J — Inventory" of the Business Personal Property Report shows that the Board asks for cost amounts and not a breakdown of inventory by part. Delta estimates that such a schedule would be longer than 14,000 pages. As discussed in Division 6, infra, the heart of this dispute is the method of valuation, not whether Delta has failed to report all of its personal property.

6. *Delta has produced admissible evidence on the valuation issue.* The Board argues that it is entitled to summary judgment on this issue because no admissible evidence exists as to the valuation of Delta's personal property other than the original cost reported on the return form. Delta, on the other hand, returned a taxable value calculated on "net book value," which Delta maintains is an amount greater than fair market value. Of course, the correct valuation of the property is fair market value.[32] Delta maintains that "net book value"

---

[30] Compare *Apollo Travel Svcs.*, supra, 230 Ga. App. 790.

[31] *Flambeau Corp. v. Morgan County Bd. of Tax Assessors*, 238 Ga. App. 812 (520 SE2d 275) (1999); *J. C. Penney Co. v. Richmond County Bd. of Tax Assessors*, 233 Ga. App. 399, 401 (504 SE2d 201) (1998); *Eckerd Corp. v. Coweta County Bd. of Tax Assessors*, 228 Ga. App. 94 (491 SE2d 173) (1997); *Stoddard v. Bd. of Tax Assessors of Grady County*, 163 Ga. App. 499, 500 (295 SE2d 170) (1982).

[32] OCGA § 48-5-6.

is evidence of fair market value and is, in the context of airplane parts, greater than fair market value. The Board attacks the admissibility of the opinion evidence presented by Delta. Perhaps a reasoned valuation of each of the 220,000 different types of parts would be preferable, but Delta has shown probative evidence supporting its property valuation by presenting admissible opinion testimony that the fair market value of its airplane parts inventory is actually less than the value it listed on the tax return. Therefore, the trial court did not err when it denied summary judgment to the Board on the issue of the valuation of Delta's personal property.

*Judgment affirmed in Case No. A00A1659. Judgment reversed in Case No. A00A1658. Pope, P. J., and Miller, J., concur.*

DECIDED OCTOBER 3, 2000 — ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Alston & Bird, John L. Coalson, Jr., Timothy J. Peaden, Mary T. Benton, Michael Keen,* for appellant.

*Hancock & Echols, Jack R. Hancock, Brian R. Dempsey,* for appellee.